# Appendix A
## Technical Assistance Report



# AMERICAN UNIVERSITY

W  A  S  H  I  N  G  T  O  N  ,  D  C

**Louisiana's 22nd Judicial District**

**Public Defenders' Office:**

**A Preliminary Assessment**

## TECHNICAL ASSISTANCE REPORT



# Bureau of Justice Assistance

### CRIMINAL COURTS TECHNICAL ASSISTANCE PROJECT

A Joint Program of the Bureau of Justice Assistance, U.S. Department of Justice, and
American University's School of Public Affairs



# AMERICAN UNIVERSITY

SCHOOL OF PUBLIC AFFAIRS
JUSTICE PROGRAMS OFFICE

## Criminal Courts Technical Assistance Project Report No. 7-190

## Louisiana's 22nd Judicial District

## Public Defenders' Office:

## A Preliminary Assessment

Consultant

Ernie Lewis, JD

January 2012

*This report was produced under the auspices of the Bureau of Justice Assistance (BJA) Criminal Courts Technical Assistance Project at American University, Washington, D.C. This project is supported by Grant No. 2010-DB-BX-K037 awarded to American University by the Bureau of Justice Assistance. The Bureau of Justice Assistance is a component of the Office of Justice Programs, which also includes the Bureau of Justice Statistics, the National Institute of Justice, the Office of Juvenile Justice and Delinquency Prevention, and the Office for Victims of Crime. Points of view or opinions in this document are those of the author and do not represent the official position or policies of the U.S. Department of Justice*

CRIMINAL COURTS TECHNICAL ASSISTANCE PROJECT
A PROGRAM OF THE BUREAU OF JUSTICE ASSISTANCE, U.S. DEPARTMENT OF JUSTICE
4400 MASSACHUSETTS AVENUE NW · WASHINGTON, DC 20016-8159 · 202-885-2875 · FAX: 202-885-2885
www.american.edu/justice

## CONTENTS

| | Page |
|---|---|
| I.  **Introduction** | 1 |
| A. Background of this Consultancy | 1 |
| B. Context in which this Technical Assistance has been Provided | 2 |
| | |
| II.  **22nd Judicial District Public Defenders' Office** | 3 |
| A. History and Demographics | 3 |
| B. Current Structure and Organizational Chart | 4 |
| C. Strengths of the Office | 4 |
| D. Three Deficiencies Identified by the ACLU | 5 |
|     1. Caseloads | 5 |
|     2. Number and Utilization of Investigators | 9 |
|     3. Resource Parity | 11 |
| E. Observations of the Consultant About Other Areas of Concern | 14 |
|     1. Client Relationships | 14 |
|     2. Motion Practice | 14 |
|     3. Preliminary Examinations | 15 |
|     4. Jury Trials | 16 |
|     5. Conflicts | 16 |
|     6. Private Practice | 16 |
|     7. Shelton Concerns | 17 |
|     8. Capitol Cases | 17 |
|     9. Capital Conflict Cases | 17 |
|     10. Life without Parole Cases | 18 |
|     11. Misdemeanors | 18 |
|     12. Juvenile Cases | 18 |
|     13. CINC | 18 |
|     14. Nonsupport | 19 |
|     15. Use of experts | 19 |
|     16. High number of felonies | 20 |
|     17. High number of probation revocations | 20 |
| | |
| III.  **Compliance of the 22nd PDO with ABA Principles and Guidelines for Indigent Defense Service Delivery** | 20 |
| A. Compliance with ABA's 10 Principles | 20 |
| B. Compliance with ABA's 8 Guidelines | 22 |
| | |
| IV.  **Office Management Observations** | 23 |
| A. Office Culture | 23 |
| B. Physical Plant | 24 |
| C. Leadership | 24 |
| D. Office Manager | 24 |
| E. Supervision | 24 |

   F. Performance Planning and Evaluations    25
   G. Training    25
   H. Recruiting    25
   I. Policies and Procedures    25
   J. Policy Work    26
   K. Staff Meetings    26
   L. Salaries    26
   M. Benefits    26

**V. Justice System Functions Relevant to the 22nd PDO's Operations**    27
   A. Prosecutorial Function    27
   B. Judicial Function    27
   C. Determination of Indigency    27

**VI. Preliminary Recommendations**    28
   1. Hire a strong leader.    28
   2. Lower caseloads for felony, misdemeanor, and juvenile attorneys by hiring additional staff attorneys and support staff.    28
   3. Establish workload standards with an overload mechanism.    29
   4. The new District Defender should work with the LPDB and local government to establish retirement benefits for all full-time staff.    29
   5. The Office needs to move from its present quarters into more professional office space.    29
   6. The new District Defender must work with the informal leaders of the office to create a client centered culture.    29
   7. Attorneys should be present at 72-hour hearings.    29
   8. Attorneys should be required to conduct a significant initial client interview shortly after the 72-hour hearing.    30
   9. Attorneys should be actively involved in advocating for reduced bond and changes in bond conditions.    30
   10. Attorneys should begin to hold preliminary examinations in significant cases.    30
   11. The new District Defender and other management need to support the lawyers when they practice zealously.    31
   12. The office should be restructured emphasizing active supervision.    31
   13. Require staff attorneys to work full-time with no private practice.    31
   14. Evaluate the quality of lawyer staff and determine who wants to remain as a full-time lawyer willing to be client centered.    31
   15. Attorneys need to spend more time in the office with regular hours.    32
   16. Create a local Task Force to address the funding deficit with a goal of achieving parity relative with the DA's Office.    32
   17. Explore the possible utilization of the money held in the Judicial Fund to meet the most immediate needs.    32
   18. Hire more investigators.    32

19. Change the duties of investigators. 32
20. Determine why the juvenile investigator is not being utilized by staff attorneys. 33
21. Designate someone other than the District Defender to supervise the investigative function in the office. 33
22. Hold regular office meetings. 33
23. Create a system of performance evaluations. 33
24. Create a salary structure that rewards merit and experience. 33
25. Reform and streamline the provision of conflict services. 33
26. Change how conflict capital cases are handled. 34
27. Consider creating a Life without Parole Task Force. 34
28. Engage with the Deputy of the LPDB for all attorneys to be trained, including on the Louisiana Performance Standards. 34
29. Work with the Deputy of the LPDB to identify future leaders and establish a course of education for them to develop into office supervisors and leaders. 34
30. Review the provision of nonsupport services 34
31. Become a community oriented defender office with the inclusion of full-time social workers. 35
32. Improve the reliability of the indigency determination. 35
33. Encourage the use of experts and ensure funding for them. 35
34. Evaluate the reason why there are so many revocations and what can be done to significantly reduce that number. 35
35. Evaluate whether revenue is being collected at an adequate and reasonable rate, particularly in Washington Parish. 35
36. Rotate attorneys more often between divisions of court. 36
37. The 72-hour hearing should be turned into a more meaningful session of court. 36
38. The District Defender should work with the Sheriff to improve the ability of public defenders to see their clients in the jail. 36
39. Prosecutors should do a more effective job of screening their cases. 37
40. Determine if the practice of pleading cases still exists, and if so, end it. 37
41. The Judiciary should encourage the development of an independent office that is the equal to the DA's Office. 37
42. Consideration should be given to staffing drug court. 37
43. Attention needs to be given to collecting data accurately and, more importantly, to utilizing that data in the management of the office. 37
44. The District Defender should utilize law clerks and interns from nearby law schools. 38
45. Upgraded presentation devices should be purchased so that the public defenders are on a level playing field with the DA's office when trying cases before a jury. 38

**VII.  Areas to Address in the Full Assessment**                              38

**VIII. Conclusion**                                                           39

**APPENDIX**                                                                   40
A. Documents Reviewed                                                          41
B. Persons Interviewed                                                         42
C. Organizational Chart of the 22nd Judicial District Public Defenders' Office 44

# LOUISIANA'S 22ND JUDICIAL DISTRICT PUBLIC DEFENDERS' OFFICE:
## A Preliminary Assessment

## I. INTRODUCTION

### A. Background of this Consultancy

This report provides a summary of the observations, findings and preliminary recommendations resulting from a review of documents and a site visit by consultant Ernie Lewis conducted December 12-15, 2011, to the Public Defender Office for the 22nd Judicial District of Louisiana, which consists of St. Tammany and Washington Parishes. This visit was made in response to a request for technical assistance submitted by Jean Faria, Louisiana State Public Defender, to the Criminal Courts Technical Assistance Project (CCTAP) at American University, in Washington, D.C.  The CCTAP provides free technical assistance and training services by senior practitioners to state and local courts and justice system agencies under a grant from the Bureau of Justice Assistance of the U.S. Department of Justice.

Ms. Faria's letter to CCTAP was prompted by a letter she received from the American Civil Liberties Union of New York, dated September 7, 2011, which stated that an independent investigation by the ACLU had led it to conclude that defendants in the 22nd Judicial District were "routinely deprived of their due process rights and rights to effective assistance of counsel."  The ACLU further alleged that the services offered by the 22nd Judicial District Public Defender Office (hereinafter 22nd PDO) "fail to meet well-established national and state ethical standards."  The ACLU specifically noted that public defenders in St. Tammany Parish "are forced to carry grossly excessive caseloads each year," that the St. Tammany Parish office provided inadequate numbers of investigative staff, and that the resources provided to the 22nd PDO "are far less than those allocated to the District Attorneys' Office."  The letter urged Ms. Faria "to take appropriate and immediate action to ensure that indigent defendants in the 22nd Judicial District are being adequately represented, and that the Public Defenders' Office meets all of its legal and ethical obligations going forward."  The ACLU raised the issue of potential civil liability, saying that the deficiencies they had identified could result in 28 U.S.C.A. Sect. 1983 liability for the supervisors in the 22nd PDO as well as the Louisiana Public Defender Board (LPDB) "for failure to ensure that rank-and-file defenders are providing meaningful representation at the critical stages of every case for which they are responsible."

In her technical assistance request to the CCTAP, Ms. Faria noted that the Louisiana Public Defender Board had been "concerned about this particular jurisdiction, which has had a significant increase in population in recent years, resulting in the need for improvement and expansion of indigent defense representation."

Although Ms. Faria's technical assistance request asked for a full-fledged evaluation of the 22nd PDO's operations and performance, CCTAP's BJA grant was scheduled to terminate at the end of January 2012, and its remaining funds were limited. Consequently, Ms. Faria and the LPDB

determined that a preliminary assessment on an expedited basis by a consultant both qualified in subject matter expertise and familiar with indigent defense operations in Louisiana would be feasible within the time and resources remaining for the CCTAP project, and would permit the LPDB to validate and prioritize for immediate corrective efforts the most serious service delivery shortcomings in the 22nd PDO. This preliminary assessment would also lay the foundation for a more comprehensive and in-depth review, should that prove necessary and funding become available.

The consultant commissioned by the CCTAP to conduct this review, Ernie Lewis, spent 31 years as a Kentucky public defender. He is the retired Public Advocate for the Commonwealth of Kentucky (i.e., the Kentucky "State Public Defender") and former Directing Attorney for the Richmond, Kentucky, Public Defender's Office. Over the past year, Mr. Lewis has been conducting training programs for the LAPDB, has conducted a comprehensive and influential previous defender office assessment in the 14th Judicial District of Louisiana under the CCTAP's auspices, and is familiar with many of the issues and practices affecting local public defender operations in the state. He agreed to conduct a "problem definition" review of the 22nd PDO with particular attention to the deficiencies alleged by the ACLU and the development of recommendations for actions by local and state actors to address any fundamental deficiencies noted in his assessment, as well as to identify areas of concern for review in a subsequent, more comprehensive study.

Prior to his site visit in December 2011, a number of telephone conference calls were conducted with Mr. Lewis, CCTAP staff, and LPDB officials to plan the technical assistance visit and discuss a wide range of issues that needed to be addressed. Available documentation regarding defender services in the district and other related materials were also compiled and sent by the ACLU and the LPDB to Mr. Lewis for review prior to the site visit. A list of the documents reviewed and individuals interviewed on site is included in the Appendix to this report.

The observations and recommendations that follow are those of Mr. Lewis.

### B. Context in which this Technical Assistance has been Provided

Interest in the quality of indigent defense in America grew during the last decade.  In April 2009, the National Right to Counsel Committee issued a report on the state of indigent defense in the United States.  Its summary read:  "Yet today, in criminal and juvenile proceedings in state courts, sometimes counsel is not provided at all, and it often is supplied in ways that make a mockery of the great promise of the *Gideon* decision and the Supreme Court's soaring rhetoric.  Throughout the United States, indigent defense systems are struggling. Due to funding shortfalls, excessive caseloads, and a host of other problems, many are truly failing.  Not only does this failure deny justice to the poor, it adds costs to the entire justice system.  State and local governments are faced with increased jail expenses, retrials of cases, lawsuits, and a lack of public confidence in our justice systems.  In the country's current fiscal crisis, indigent defense funding may be further curtailed, and the risk of convicting innocent persons will be greater than ever.  Although troubles in indigent defense have long

existed, the call for reform has never been more urgent." *Justice Denied: America's Continuing Neglect of our Constitutional Right to Counsel* (2009).

As this report was being written in December of 2011, Professor Norman Lefstein published *Securing Reasonable Caseloads: Ethics and Law in Public Defense* (2011). He cited *Justice Denied* as well as another report entitled *Minor Crimes, Massive Waste: The Terrible Toll of America's Broken Misdemeanor Courts,* National Association of Criminal Defense Lawyers (2009). Together, these three reports document the sad state of indigent defense nationwide, centered particularly on the failure of public defender programs to control excessive caseloads for their attorneys.

The current problem definition report is written following a visit to St. Tammany Parish, Louisiana. In many ways, many of the conditions found in the public defender system in the 22nd Judicial District are a microcosm of those identified in the three reports cited above. Further, this report is for the most part consistent with the ACLU letter that precipitated the technical assistance.

Within this context, the present technical assistance review has been conducted, with the objective of documenting the existing system for providing indigent defense services in the 22nd Judicial District, identifying problem areas, noting the need for further study, and providing preliminary recommendations, as appropriate, for improving the management and organization of indigent defense service delivery in the District. Because the criminal justice system is just that, a system that involves the judiciary, the prosecution, and other criminal justice entities, other recommendations are made touching on those entities where the problems are interrelated.

One other development is significant. Following the ACLU letter and immediately prior to the site visit, John Simmons, the long-time District Defender of the 22nd PDO, announced that he intended to resign effective March 2012. This development is important and will enable this technical assistance to be used by the next District Defender to improve significantly the delivery of services in the 22nd PDO.

## II. 22nd JUDICIAL DISTRICT PUBLIC DEFENDERS' OFFICE

### A. History and Demographics.

The Public Defender Office for the 22nd Judicial District is a mostly full-time[1] office located in Covington, Louisiana. It began in 1977 as a small office, and gradually grew into a much larger office with two satellite offices located in Slidell and Franklinton. For most of its history, the office has been overseen by a local indigent defense board. The present director, John Simmons, joined the office as director in 1980. He began the Office of Indigent Defense in Orleans Parish in 1964 and thereafter was Associate Dean with the National College of Criminal

---

[1] The 22nd PDO requires attorneys to work 40 hours per week and, thus, considers itself a full-time office. The attorneys are allowed to have private civil practices, however.

Defense in Houston, Texas, for several years. After a short stint with the Department of Energy, he came to the 22nd JPDO as its first Chief. At the time, there were three lawyers in the office along with Mr. Simmons. Initially the office was located in a trailer behind the courthouse. The office has been physically located in three offices in Covington, moving to its present location at 402 North Jefferson St. several years ago. The office is provided rent free by St. Tammany Parish. An office was also opened up in Washington Parish in Franklinton, and eventually in Slidell. Mr. Simmons made the decision early on to put one lawyer into each division of court, beginning the provision of vertical representation. The office initially handled its own appeals, but this function was shifted to contract attorneys through the contract entity known as the Louisiana Appellate Project.

In 2007, Act 307 became the law in Louisiana. As a result of this significant reform, the local indigent defense board was dissolved, with oversight of the local system shifting to the Louisiana Public Defender Board. John Simmons remained as the District Public Defender.

The office covers two parishes, St. Tammany and Washington Parishes. This is a relatively affluent district. St. Tammany Parish, located on the north shore of Lake Pontchartrain, is a rapidly growing suburban parish with a population of 233,740, up from 191,268 in 2000. The unemployment rate as of November 2011 is only 5.5%, compared to 6.9% for the State of Louisiana. 83% of the population is white, 11.4% African-American, and 4.7% Latino. The median household income is $58,868, compared to $42,460 for the State of Louisiana. The poverty rate in 2010 was 9.2%, compared to 18.8% for the state as a whole.

Washington Parish is the poorer of the two parishes. It has a population of 45,669, up from 43,926 in 2000, and is mostly rural. 66% of the population is white, 31% is African-American, and 1.3% is Latino. The median household income is $31,659 (2009), compared to $42,460 for the State of Louisiana. The poverty rate of 26.9% in 2010 was higher than the state poverty rate of 18.8%. The unemployment rate in November of 2011 was 10.4%, compared to 6.9% for the State.

There are 12 court divisions (10 general jurisdiction and two limited jurisdiction) and two district court locations (one in each parish) in the 22nd Judicial District as well as four city courts, one each in Covington, Bogalusa, Mandeville, and Slidell. The DA's office is located in Covington. There are four jails in the 22nd Judicial District ,one each in Covington, Franklinton, Slidell, and Bogalusa. Louisiana has the highest rate of incarceration in the United States, at 814 per 100,000. The 22nd Judicial District has a reputation as a conservative jurisdiction, with judges and prosecutors who are "tough on crime." An article on Nola.com would support that reputation, reflecting on a man named Cornell Hood II who was sentenced to life imprisonment for possession of marijuana after three previous such convictions in New Orleans.

### B. Current Structure.

The office has a very simple top-down structure. At the top of the organization chart is the District Defender, John Simmons, his first assistant, Kevin Linder, and Jack Stevenson, the Administrative Assistant. There are no divisions or sections, nor is there a particular chain of

command. Below the top three on the organization chart are subject matter entities consisting of Capital Defense populated by two contract attorneys and one mitigation specialist; St. Tammany Parish District Court Defenders consisting of 12 full-time attorneys, two investigators, and seven support staff; Washington Parish District Court Defense, consisting of three attorneys and two support staff; City Court Defense, consisting of three attorneys and one support staff; and the CINC Adult Contract Division, consisting of five attorneys. No one serves as a supervisor other than Mr. Simmons in either the Franklinton or the Slidell Offices. Indeed, there are no supervisors in the office other than Mr. Simmons. The entities do not meet as a group. Everyone in the 22nd PDO answers to the District Defender. The first assistant is available to answer questions but is not in a formal supervisory relationship with the staff attorneys or anyone else. There are over 20 conflict attorneys, all of whom are in private practice. The conflict attorneys are not noted on the organization chart nor are they supervised or overseen by anyone in the office.

### C.  Strengths of the Office

The office has a strong history with a charismatic and well respected leader at its helm. "Mr. John" has led this office since 1980, and in many ways has been the face of the office. He has upheld the value of excellence in representation over the years, trying numerous cases, including capital cases, and affirming the value of a strong defense. He has been the person doing the entire hiring and firing as well as setting all of the policies for the office. He has served long and well. He has announced his retirement as of March 2012.

The office is for the most part staffed with full-time lawyers who are allowed to have a small private practice. Some of the attorneys maintain a private practice while others do not. The office tracks the hours spent on private practice on a monthly basis. The office has seasoned contract attorneys handling capital cases, and the results have been impressive. Attorneys handling felonies are for the most part also experienced. Staff attorneys handling misdemeanors and juvenile cases appear to know their way around their courtrooms and to understand how to resolve the high volume of cases to which they are assigned. Many observers praised the experience and skill of the staff attorneys. Attorneys feel that they "have one another's back."

The office has a skilled administrative assistant and an office manager, both of whom appear quite capable and responsible, but both of whom wear too many hats.

The 22nd PDO is located in one of Louisiana's most affluent areas, particularly St. Tammany Parish. This would appear to allow them to address deficits that are identified below.

### D.  Three Deficiencies Identified by the ACLU

Before going through the three deficiencies identified by the ACLU, it is appropriate to note that the District Defender, John Simmons, disagrees with the ACLU report in part. He believes that their allegation regarding caseloads is not accurate. However, he also stated that his lawyers were "not doing as much as they could do," and that "if I could force the lawyers to do what they should do, I'd lose half my staff." He appeared powerless to change the culture of

the office, saying that "I'd like to get rid of some, but I'd not be able to replace them with ones who are any better." He does agree that resources are insufficient and that there are too few investigators on staff.

### 1. Caseloads

The American Bar Association as well as the national defender community have been concerned with excessive caseloads in public defender offices for many years. In 2002, the ABA House of Delegates approved the *Ten Principles of a Public Defense Delivery System*. Principle #5 requires that "Defense counsel's workload is controlled to permit the rendering of quality representation." This was followed by ABA Formal Opinion 06-441 (2006) which stated that "If workload prevents a lawyer from providing competent and diligent representation to existing clients, she must not accept new clients." This formal opinion made crystal clear that public defenders, public defender supervisors, and lawyers in charge of public defender offices, all bear ethical responsibilities as well as liability with regards to caseloads that are so excessive as to interfere with quality representation. In response to the ABA Formal Opinion, the American Council of Chief Defenders issued a *Statement on Caseloads and Workloads* in 2006 reaffirming the National Advisory Commission's maximum case numbers of no more than 150 felonies, 200 juvenile cases, or 400 misdemeanor cases in a year. Finally, in August of 2009, the ABA House of Delegates approved the *Eight Guidelines of Public Defense Related to Excessive Workloads*. This document reiterated the obligation of the public defender office to avoid "excessive lawyer workloads and the adverse impact that such workloads have on providing quality legal representation to all clients."

LPDB has promulgated rules that comport with these ethical guidelines in the Trial Court Performance Standards (LAC22:XV.Chapter 7), (hereinafter LPDB Performance Standards). Rule 707(E) states that when "counsel's caseload is so large that counsel is unable to satisfactorily meet these performance standards, counsel shall inform the district defender for counsel's judicial district and, if applicable, the regional director, the court or courts before whom counsel's cases are pending. If the district defender determines that the caseloads for his entire office are so large that counsel is unable to satisfactorily meet these performance standards, the district defender shall inform the court or courts before whom cases are pending and the state public defender." The contract entered into between LPDB and the 22nd PDO establishes that the office will comply with caseload limits with only a 5% variation.

Caseloads have been increasing rapidly in the 22nd PDO in recent years, rising more quickly than the population. For example, in 2006, there were 4324 new cases[2] opened and 4820

---

[2] A "case" is defined in Act 307 at La. RS:15:174(C): "For purposes of this Section, a 'case' is defined as a charge or set of charges contained in a charging instrument or petition against a single accused arising out of one or more events, transactions, or occurrences, which are joined, or which may be joined pursuant to Code of Criminal Procedure Articles 490 through 495.1. Cases that involve multiple persons accused are counted as a separate case for each person accused. Cases that involve multiple charges or counts are recorded with the highest charge, based on the severity of sentence for the crime charged, as the case type. Multiple charges against a single person for the issuing of worthless checks shall be counted as a single case. Each appeal, after conviction, shall be counted as a separate case. In the event that a charging instrument contains a charge or set of

closed. Data for 2011 show 10,444 new cases, and an inventory of 4470 cases carried forward in CY2011 from prior years, for a total office workload of 14,914 cases during 2011. Of this total, 8033 cases were closed during the year. These figures constitute a significant increase in the last five years. Under these circumstances and despite the office's budget increasing a great deal during this period, one would expect that the individual defenders would be under significant strain.

The ACLU letter alleged that "[i]ndividual defenders in St. Tammany Parish are forced to carry grossly excessive caseloads each year." The letter noted that there were "only eight felony defenders responsible for handling well over 3500 new and existing felony and revocation cases in 2010, amounting to an average of more than 435 cases per attorney for the year."

As noted above, there are important national standards that are applicable to defender practice. The familiar National Advisory Commission (NAC) standards call for no more than 150 felonies, 200 juvenile cases, or 400 misdemeanors in a given year. These standards have been consistently reaffirmed, including in the ABA Formal Opinion #06-441, the ABA *Ten Principles* (2002), and the American Council of Chief Defenders *Statement on Caseloads and Workloads* (2006).

Based upon the site visit and review of documents, the consultant is able to conclude that there are serious concerns regarding public defenders' caseloads in both parishes of the 22nd Judicial District. In 2011, there were 4030 non-capital felonies and 65 life without parole (LWOP) cases handled by the 22nd PDO's staff attorneys. While most of the defenders carry mixed caseloads, a review of individual defender caseloads for 2011, including both new cases and cases carried forward from previous years, revealed that most full-time attorneys did indeed carry excessive felony caseloads in 2011. For example, in Tammany Parish, Michael Capdeboscq handled 695 cases, including 354 felonies and four LWOP cases, far exceeding the maximum of 150 felonies set by the NAC. David Craig handled 695 cases, including 328 felonies and four LWOP felonies. Accounting for the remaining Tammany Parish felony attorneys: John Hogue handled 650 cases, including 338 felonies and four LWOP cases; Peter Irerardi handled 753 cases, including 385 felonies and two LWOP cases; Richard Oriol handled 652 cases, including 349 felonies; David Sirera handled 531 cases, including 328 felonies; Robert Stamps handled 750 cases, including 385 felonies and two LWOP cases; and Melissa Valdivia handled 637 cases, including 378 felonies and five LWOP cases. James Talley, in Washington Parish, handled 447 cases, including 427 felonies and two LWOP cases.

While these felony caseloads far exceeded the recognized national standards of no more than 150 felonies per year, of particular concern is that each of these attorneys carried excessive felony caseloads while at the same time representing a number of cases carrying possible

charges arising out of multiple events, transactions, or occurrences, indigent defender boards shall track, record, and report the number of such instances per charging instrument." This caseload definition is consistent with nationally recognized standards for defender case counting.

sentences of life without parole. These cases, while not capital in nature, demand a great deal more of the attorney in terms of dealing with the client, investigation, motion practice, and trial.

A snapshot of open cases at one time is also instructive. As of 12/11/11, David Craig had 303 open files, including 107 open felonies.   John Hogue had 380 open files, including 130 open felony files. Melissa Valdivia had 397 open files, including 101 felonies as of 12/11/11. Michael Capdeboscq carried 379 open files, including 115 open felonies. Peter Ierardi had 386 open cases, including 161 open felony files.  Richard Oriol had 440 open files, including 157 open felonies.

The ACLU letter noted that caseloads for the misdemeanor attorneys were also excessive, "averaging approximately 600 cases each" in 2010.   The consultant found the caseloads exceeded those figures in 2011. Nancy Bousfield handled 1289 misdemeanor and juvenile cases in 2011, including 204 misdemeanors and 370 juvenile cases, far exceeding the 400 misdemeanor **or** 200 juvenile case NAC standards.   Michael Bradley handled 1517 mostly misdemeanor cases, again far in excess of the 400 misdemeanor standard. D'Andrea Chatman handled 1266 cases including 805 misdemeanors. Shannon Mese handled 1074 cases including 624 misdemeanors.  Jennifer Cruseturner handled 1808 nonsupport cases; while the NAC Standards do not establish the maximum for nonsupport cases, the assumption is that these are more like misdemeanor cases, the maximum of which is 400.

The caseloads handled by the juvenile lawyers in the 22nd also raise concerns. Nancy Bousfield is addressed above.  370 of her 1289 cases were juvenile cases, including 150 felonies, far exceeding the 200 NAC standard for juveniles.   Amanda Trosclair handled 369 cases in 2011, including 214 juvenile cases. She called her caseloads "far too high," and "ridiculous." In Slidell City Court, "I represent everyone in the courtroom."

The 22nd PDO has assigned capital cases to two contract attorneys.  While the consultant was not able to interview the two contract attorneys, there was no indication during the site visit that anyone viewed the caseload for them as excessive.  These attorneys handled 10 capital cases in 2011.

John Simmons stated that no attorneys had come to him to complain about having excessive caseloads. He also believed that attorneys were not doing what they could to be reducing their caseloads. They could be "working their caseloads," according to Mr. Simmons.

Attorneys who have not been trained on the *Eight Guidelines* tend not to know what to do when their caseloads exceed the national standards.  Usually attorneys find ways to cope by triaging, cutting corners, eliminating client visits, pressuring clients to plead guilty short of a complete investigation, or failing to file vigorous pretrial and sentencing motions.  One felony attorney stated that he agreed that caseloads were **too high**.  Are they "grossly excessive?"  "It depends upon the cases that are immediately **pending**."  "I don't know; I would rely upon the numbers."  "I do know that I cannot do everything that I should do.  I feel like I spend a lot of

time triaging. I struggle with the ideal." Triaging even misdemeanors is not acceptable; triaging misdemeanors or felonies can lead to innocent persons being wrongfully incarcerated.

Others outside the office agreed with the ACLU allegation that caseloads were excessive. For example, retired District Judge Patricia Hedges characterized the caseloads handled by felony attorneys with the 22nd PDO as "ridiculous. Private practitioners would not dream of handling that many cases."

In the recently published book, *Securing Reasonable Caseloads:  Ethics and Law in Public Defense* (2011), Professor Norman Lefstein states "[W]hen excessive caseloads are the norm, there are insufficient client interviews, motions are not filed for pretrial release and other purposes, investigation of the client's case is either inadequate or nonexistent, and preparation for hearings, trials, and sentencing, to mention just a few of the defense lawyer's basic tasks, are given short shrift. The result is that the accused is not treated fairly, which is the essence of due process of law, and frequently the justice system incurs both damage to its reputation and unnecessary expense."

In sum, the consultant agrees with the allegations made in the ACLU letter. Caseloads in the 22nd PDO exceed national caseload standards at all levels with the possible exception of capital cases.

## 2.  Number and Utilization of Investigators

The ACLU alleged in its letter that the office "employs just two investigators, only one of whom is responsible for investigating the thousands of felony and misdemeanor cases handled by the office each year." The letter relies upon Standard 4.1 of Guidelines for Legal Defense Systems in the United States (1976), which reads in part:  "Defender offices should employ investigators with criminal investigation training and experience. A minimum of one investigator should be employed for every three staff attorneys in an office. Every defender office should employ at least one investigator." The letter also notes that a great deal of one of the investigator's time is devoted to attending the 72-hour hearing.  The letter quotes "sources" to say that "investigations rarely take place at all..." The letter concludes that this deficiency "makes it practically impossible for public defenders in St. Tammany Parish to provide the quality of representation to which defendants are entitled..."

The ACLU allegations regarding the investigative function are accurate for the most part. There are only two investigators, one of whom is devoted to the felony investigations and the other purportedly to juvenile cases[3].  No investigators are available for misdemeanors, CINC, or nonsupport cases. They are both experienced investigators. One had experience with the FBI, the US Marshall's Office, and the Sheriff's Office, while the other investigator was with the Sheriff's Office. Both of them strongly agree with the ACLU letter.

---

[3] Investigators (and mitigation specialists) for capital cases are hired , as needed, from the expert fund of the office budget.

The two investigators perform few investigative tasks.   At least half of their time is spent identifying who has been appointed at the St. Tammany Parish Jail.  Both of the investigators attend the 72-hour hearings where initial public defender appointments are made, which occur in St. Tammany Parish Jail two days a week.   They interview all of the individuals who are appointed at the 72-hour hearing, and then make their own probable cause "determination." They also make phone calls to family members and others regarding bond.  This process takes half of the week, leaving only half for their investigative function.

The felony investigator conducts investigations when requested to do so by staff attorneys. He does so without a written investigative request.  Most requests for investigation are done orally and at the last minute immediately prior to trial. There are no early investigations even when the defendant alleges an alibi or other indication of innocence.

The juvenile investigator is not requested to conduct investigations, and there is considerable confusion among the attorneys regarding what work she does. There also appears to be some distrust of the juvenile investigator, without anyone in management attending to this misallocation of resources.

Significantly, no investigator is assigned to work in Washington Parish.   There are no policies regarding the investigators. No written investigative request is required in order to initiate the investigation.  No data exists to demonstrate the workload of either investigator.

The investigators drive their own cars and are paid $.48 per mile to do so.  They also are required to use their own cell phones.  They have one camera between the two of them, and use the one laptop that is in the office. The investigators are never asked to prepare exhibits.

Attorneys in the office did not express a lot of concern regarding the lack of investigative capacity.  There seemed to be a sense of resignation with the way things are.  Very few of the attorneys use the investigator.  The investigators are not available to the misdemeanor attorneys.  One attorney said that "basically we investigate our own cases."  One conflict lawyer who had been a full-time public defender stated that the way the office is set up a full-time attorney would be unable to prove his client's innocence because of the paucity of investigators.  A staff lawyer when asked whether the investigative function was sufficient replied succinctly "not even remotely."  When she has asked for help, "it's not done."  A staff lawyer related that one time she asked an investigator to obtain medical records and when this was not done it was explained by the investigator that she didn't perform the task because "I don't have money for gas."

Significantly, there are no investigators for the conflict attorneys.

Based upon the above, the consultant agrees that the investigative function as it presently exists in the 22nd PDO is not sufficient.  There are not enough investigators for the number of attorneys and for the high felony caseload.  There is no oversight of the investigators.  In

addition, there is not a good understanding of how investigators should be used, and there are no policies in place to facilitate the effective use of the investigators who are on staff.

### 3. Resource Parity

The third primary allegation made by the ACLU is that there exists a serious resource imbalance between the District Attorney's Office and the 22nd JPDO, as reflected in raw numbers, in salaries, and in staffing of investigators. The letter notes that the situation in the 22nd PDO violates principle #8 of the ABA's *Ten Principles* (2002), which reads that "[T]here is parity between defense counsel and the prosecution with respect to resources and defense counsel is included as an equal partner in the justice system." The data presented and the observations made during the site visit support this allegation as well. In fact, of the three allegations made by the ACLU, this one is virtually universally accepted by all those contacted both inside and outside the office.

John Simmons states that the office has "always been underfunded." He states that while the office's resources have increased in recent years, added responsibilities, particularly with the addition of CINC cases, have taken away any relief. Indeed, in Mr. Simmons' view, the office is "worse off since Act 307."

Mr. Simmons' view as well as the ACLU's allegation is widely supported. Sheriff Strain, who has been the St. Tammany Parish Sheriff for 16 years, stated simply that the "office needs to be better funded." He stated that he had attempted to convince parish officials to increase funding for the 22nd PDO and stands ready to do so again. First Assistant DA Hammie Gascon agreed that the office was underfunded. Retired Judge Patricia Hedges stated simply that "they do the best with what they have." She went on to state that the JPDO is not "treated equally with the DA when money is handed out. If the DA wants money, he gets what he wants; when John asked, he never got what he wanted." Judge Peter Garcia stated that "resource inequity is obvious."

Resources made available to the 22nd PDO have risen in recent years along with the caseload. The expenditures of the 22nd PDO have virtually doubled in the past five years, from approximately $1.3 million in FY 06 to $2.7 million in 2010. This occurred at the same time that St. Tammany Parish .in particular, increased by 40,000 people during the last decade, partly as a reaction to Hurricane Katrina.

In 2009, the 22nd JPDO received $2,407,075 in total income and spent $2,481,006. Of the total income, $984,743 was provided by the LPDB; the remainder came from local sources. In the same year, in documents provided by the ACLU, the District Attorney's Office received $4.2 million in revenue, while they spent $3,911,121. At the end of 2009, the DA's Office carried a fund balance of over $1.5 million. In the 2011 fiscal year, the 22nd PDO took in revenue of $2.2 million with budgeted expenditures of over $2.9 million. A comparison with the DA's Office for the same period of time was not available. It should be noted that the DA's office has a number of sources of revenue, including diversion, asset forfeiture, and bond forfeiture funds.

It should be noted that the documents from the ACLU are incomplete. There are 112 persons on staff as of 2008 at the DA's Office, including 34 prosecutors. Most of the DA's made over $75,000 as of 2008. $55,000 appears to be the lowest salary for any full-time DA. $4.2 million would provide only $37,500 per staff member if all of that went to salaries. It is clear that the documents provided to the ACLU did not portray all of the funding for the DA's office, increasing the disparity with the PDO. Their budget is clearly much higher.

"Parity" however does not mean that the prosecution function and the defender function should receive identical sums of money. Obviously, prosecutors handle 100% of cases while defenders handle those cases involving the indigent accused. Prosecutors review cases in order to determine whether a bill of information should be filed, they deal with victims, and they decide how they want to resolve the case through either a plea or a jury trial. Defenders have a client who must be interviewed, the case must be investigated from the beginning, motions must be filed regarding bond and other issues, the case must be prepared for trial or plea, and sentencing advocacy must occur, all of which are different than the duties of the prosecutor's office.

Other factors, then, should be considered in addition to comparing annual income and expenditures. When reviewing the other intangibles, it is clear that the 22nd PDO does not have resource parity with the DA's Office. The physical plant in which they are located acts as a symbol of this disparity. The DA's Office is located on the 2nd floor of the brand new beautiful Judicial Center. The offices are attractive. Attorneys have their own individual offices with new furniture. The waiting area is well appointed and inviting. In contrast, the PDO is just two blocks from the Judicial Center but a world away. It is located in an old building for which the PDO pays no rent. The waiting area resembles most of the other social service offices to which poor people must attend, featuring a sign that is anything but welcome: "Effective August 15th, 2003 a $40.00 Non-refundable Application Fee for Indigent Counsel will be in effect as directed by Louisiana Law. Only Money Orders Payable to the Public Defender Office will be accepted." A hard bench is available for waiting. There are no individual attorney's offices other than for the director. One room has three attorneys and three secretaries in it separated by dividers. The hallways are cluttered. Ceiling tile is discolored and in some instances partially gone. The office is anything but welcoming to clients or professional in appearance or spirit. It appears tired and worn out compared to the sharp and professional appearance of the DA's office.

Other differences support the disparity. Salaries between the two offices are anything but equal. The ACLU letter noted that the "median salary of assistant district attorneys in the 22nd JDC was $80,142 in 2009, while salaries for defense counsel averaged under $58,000 in the same year." DA staff has a generous defined benefit retirement plan (3.5% x number of years to determine % of highest salary). The 22nd PDO staff has no retirement whatsoever. There are at least 34 full-time DA's. This compares to only 22 full-time defenders. The disparity worsens when examining support staff. The DA's Office has 26 investigators (not to mention the entire well-funded law enforcement community.) There are only two investigators in the 22nd PDO.

There are no social workers in the PDO.  The DA's office lists 54 clerical staff compared to nine support staff in the PDO.

One staff attorney came to the interview with the consultant with a chart comparing the benefits of being a DA vs. being a defender.  He noted that the median salary for a DA was $80,000 per year, while the median salary for a public defender was $58,000.  He noted that the DA's had a car, a gas card, retirement, and a cell phone; public defenders had none of those benefits.  He noted that each DA had an investigator while the PD's Office featured one investigator for 10 felony attorneys.

One conflict attorney who had been involved in the system for over 20 years characterized the situation as "David vs. Goliath."  That captures the situation nicely.

An effect of the lack of resources is also demonstrated in the conflict system.  This is a system that requires private lawyers to work virtually pro bono.  They are paid $40 per hour out of court and $60 per hour in court.  According to a document signed by John Simmons dated July 18, 2007, conflict cases are capped at $2000 for capital cases, $1000 for felonies, $750 per day for trial, and $600 for a misdemeanor and juvenile case.  One private lawyer who handles conflict work including capital conflicts wrote in an e-mail dated November 14, 2011, that he believes "that the St. Tammany Parish Public Defender's Office is grossly underfunded. Unfortunately, this lack of proper funding results in significant violations of the ABA guidelines pertaining to the funding of attorney's fees and costs in capital cases and inadequate attorney's fees for non-capital cases."  He concludes that the "underfunding of both capital and non-capital cases presents major problems for conflict attorneys and certainly threatens the adequate representation of both capital and non-capital defendants."

The lack of funding for the indigent defense function in the 22nd Judicial District is striking and is the primary cause of the other deficiencies identified by the ACLU and in this report. "Lack of funding is a significant barrier to providing quality public defense. While funding has increased since *Gideon*, it remains insufficient. This is contributing to high caseloads, which in turn, constrains the amount of a time a defender can spend with each client, and generally hinders the quality of representation people receive. Limited funds can lead to understaffing and a lack of access to investigators, experts, support staff, interpreters, forensic services, technology, office equipment and legal research."  *System Overload:  The Cost of Under-Resourcing Public Defense*, The Justice Policy Institute (2011).

The consultant joins with all those interviewed to agree with the ACLU's third allegation that there is a significant resource imbalance between the DA's Office and the 22nd JPDO.

E. **Observations of the Consultant Regarding Other Areas of Concern**

   1. **Client Relationships**
   Rules #709, 711, and 713 of the LPDB Performance Guidelines all contemplate a public defender who interviews his client early and completely in order to argue for pretrial release, identify investigative needs, holds a preliminary examination, and otherwise advocates for his client in preliminary court hearings.

While the site visit did not include meetings with clients, there were indications that there were systemic impediments to healthy attorney/client relations. Attorneys are not present at the 72-hour hearing and in many instances do not meet with their clients until arraignment many weeks later. The only interview done at the 72-hour hearing is by the investigator. Attorneys commonly do not vigorously pursue and seldom ask for preliminary examinations. Judge Peter Garcia noted that he had seen instances where the public defender was meeting his client for the first time at arraignment. There is always a "duty day attorney" available for drop-ins at the office rather than having all of the attorneys available. Jail visits do not occur often. One attorney stated that she saw her clients within 30 days after appointment. John Simmons said that he wishes the attorneys saw their clients more, but appeared powerless to do anything about it. In the misdemeanor practice, most of the work with clients is accomplished in court while meeting the client for the first time. What this means is that attorneys, while assigned a client shortly after the 72-hour hearing, often do not meet their clients for 60 days. Without early and periodic meetings with clients, the attorney-client relationship cannot thrive.

   2. **Motion Practice**
   Motion practice is a vital part of the effective assistance of counsel. It is through the filing and arguing of motions that counsel upholds the rights of his clients, suppressing damaging or illegally obtained evidence, securing a preliminary examination or hearing on a suggestive eyewitness identification, obtaining expert assistance, speaking to the court about inherent unfairness in the proceedings, setting out arguments for bond, or creating a proposed alternative disposition. Guideline 5.1 of the *NLADA Performance Guidelines for Criminal Defense Representation* as well as Rule 723(B) of the LPDB Performance Guidelines state that the "decision to file pretrial motions should be made after thorough investigation, and after considering the applicable law in light of the circumstances of each case." The Commentary to the NLADA Performance Guidelines notes that while the guidelines do not mandate filing motions, it does "mandate that counsel consider all potentially appropriate pretrial motions, so that the absence of pretrial motions is a result of professional choice, not negligence or inexcusable error."

The site visit did not reveal a vigorous motion practice in the 22nd PDO. While the site visit did not include file reviews, interviews with staff attorneys revealed that most cases contain only a routine bond reduction motion, a motion for discovery, and few other motions. Bond reduction motions are prepared by support staff and are not client specific. A secretary related that one attorney withdraws many bond reduction motions and has to be reminded of the need to file them. It appears that bond reduction motions while being routinely filed often take

4-6 weeks to be heard, partly because attorneys are not pushing to have their motions heard. There are few if any sentencing motions.  There are "Wallace motions[4]" that are routinely filed by the office after the first assistant reviews the documents for violations of the requirement that probable cause be determined within 48 hours (*County of Riverside v. McLaughlin*, 500 U.S. 44 (1991)).  One lawyer stated that he had just filed five Wallace motions and three had been granted.  All three were then re-arrested on a warrant.   One conflict lawyer stated that public defenders are punished for filing motions to suppress and for going to trial.  One of the staff lawyers lamented that she did not file motions other than discovery motions because of her caseloads.  The office does not have a motion bank.  One staff attorney revealed that he was chastised by Mr. Simmons for requesting a transcript needed to challenge a DUI.

### 3.   Preliminary Examinations

Guideline 3.2 of the *NLADA Performance Guidelines* as well as Rule #715(A) state that where "the client is entitled to a preliminary hearing, the attorney should take steps to see that the hearing is conducted timely unless there are strategic reasons for not doing so."  The commentary to this guideline also says that "Heavy caseloads or chronically late appointment by the courts of counsel for indigent clients…should not be used to routinely justify ignorance by counsel of facts at the time of preliminary hearing."   Likewise, LPDB's Performance Standards, Sec. 715, state that the attorney should "take steps to see that the hearing is conducted in a timely fashion unless there are strategic reasons for not doing so."

Preliminary examinations are an important part of the criminal process.  Bond can be lowered allowing the defendant to go back to work and be restored to his family.  Cases can fall apart at the preliminary hearing.  The judge can find no probable case.  The prosecutor can decide to resolve the case at that stage.  An early plea to a misdemeanor can occur after testimony is taken.  Defendants can be diverted out of the criminal process and into drug or mental health treatment.  Witnesses can be required to testify before their memories fade or are shaped by the parties.  Clients can see what the evidence is against them and can also see how their attorney fights for them.

Compare this to what the typical 22nd PDO client experiences.  He is arrested and some 1-3 days later appears at the 72-hour hearing.  The prosecution has 60 days in which to file a bill of charges.  During that time, the client seldom sees his lawyer.  While a preliminary examination can be demanded, that seldom happens.  The client does not see or confront his primary accuser.  He has no opportunity to plead to a misdemeanor.  His attorney does not obtain valuable impeachment evidence.  Often the client does not do anything other than sit in jail until the time of his arraignment. None of the advantages inherent in the holding of preliminary examinations is occurring on a regular basis in the 22nd Judicial District.

Why are preliminary examinations virtually nonexistent?  The consultant found that there is no culture or practice of viewing preliminary examinations as a valuable part of the process or as having any particular benefit.  The expressed reason for this **is** that the DA's Office practices

---

[4] State v. Wallace, 2009-KK-1621 (La.11/06/2009); 25 So. 3d  720.

"open file discovery.[5]"  Further, there exists among the staff attorneys the belief that if a preliminary examination is requested there will be a significant downside from both the judiciary and the DA's Office.  One former staff attorney said that the attitude of many DA's is that "you can have your PE, but I'm billing all of your clients."  A local conflict lawyer stated that "judges have intimidated the PD's and private bar into not asking for PE's.  If you file for a PE, they set it for a really busy docket and not get to it."

### 4.  Jury Trials

This is an active jurisdiction when it comes to trying cases.  The DA's Office trumpets its numbers of jury trials.  The DA's Office reports having 114 felony jury trials in 2010. Reviewing 22nd JPDO for 2010 numbers reveals 42 trials by the full-time felony attorneys and 15 by conflict counsel (with 1 attorney's numbers disregarded due to an obvious mistake).  Six capital trials were also noted.  Preliminary figures for 2011 show a total of 37 felony jury trials and four LWOP jury trials in 2011.  There were six acquittals among the 41 jury trials. Approximately 1% of the felony cases were tried by the PDO -- 41 out of 4051 felonies.  This is consistent with what is happening nationwide, with felony trials declining in both state and federal courts.

### 5.  Conflicts

Conflicts are handled by a large group of private lawyers, usually totaling over 20. They are chosen by John Simmons according to his knowledge of their skill level.  Once chosen, they are not supervised or overseen in any sense.  Many of them agree to handle conflicts out of a sense of obligation to indigent defense rather than to earn money.  Their pay is paltry, covering only their overhead, if that.  They are paid $40 per hour out of court and $60 per hour in court.  Worse, the amount they are paid is capped at $1000 per felony, $600 per misdemeanor, and $750 per trial day.  Payment is made only at the end of the case, which is particularly onerous in capital cases.  $186,528 was spent in 2011 on conflicts.  One attorney has sent a letter to John Simmons saying he could not continue to work as a conflict lawyer for the pay.  That same attorney stated that the effect of the low pay was that client visits are minimized and defenses aren't developed as they should be.  He suggested also that the conflict panel be reduced in size, increased in quality, and paid as contractors rather than by the case.

### 6.  Private Practice

Establishment of a full-time public defender office is one of the best methods for delivering services in a high quality and cost-efficient manner.  Standard 5-1.2 of the ABA *Standards for Criminal Justice Providing Defense Services* (3d. Ed. 1992)(hereinafter ABA Standards) recommends a full-time defender organization for jurisdictions with a sufficient population and caseload.  A full-time office can lead to the staff attorneys being the local criminal justice experts.  The office can be monitored for quality and resist pressures from judges and prosecutors to compromise.  Attorneys in the office can have a vigorous pretrial

---

[5] But see *State v. Forest*, 2008-KK-1474 (La. 07/24/2008); 986 So. 2d 677 (holding that discovery is waived where the defendant does not file a discovery motion).

practice, investigate cases thoroughly, try cases that need to be tried, and ultimately represent the whole client by becoming involved in specialty courts such as drug court, mental health court, housing, collateral consequences, and other legal needs. However, creating a full-time office is not a panacea. One serious risk of establishing a full-time office is that its efficiency can be taken advantage of by the funding authorities, resulting in under-funding that creates immense pressure on the attorneys to plead their clients guilty, taking away the independence that the full-time system promises. Such is the case in the 22nd Judicial District.

District Defender John Simmons allowed staff attorneys to have a private practice from the beginning of the office. In his view, if it does not interfere with the office, private practice should be allowed. This is also set out in the Employee Handbook, which states that private civil practice is allowed while criminal practice is prohibited. Jack Stevenson tracks each attorney's time spent in the office and in their private practice. This ranges from 0 hours per month spent on private practice to 120 hours by one attorney. Most attorneys state that attorneys do not work long hours on their private practices, and most do not maintain offices. One lawyer at least maintains an office in New Orleans. Other attorneys say that there is considerable private practice. One attorney stated that while the employee handbook states that no criminal practice is allowed, the reality is that some of the attorneys do have a criminal practice outside the office. Significantly, very little overtime appears to be spent by the staff attorneys.

### 7. Shelton Concerns

The site visit did not reveal concerns that individuals who were eligible were being denied a public defender. Indeed, virtually everyone who appeared at the 72-hour hearing was appointed a public defender with little review of indigency by the magistrate. If anything, it appears that there might be over-appointment occurring.

### 8. Capital Cases

The 22nd Judicial District is by all accounts a very active capital jurisdiction. However, it was reported that the DA's Office is not seeking the death penalty in as many cases as it once did, a very positive development. In 2011, there were 10 cases handled by the office. The office did have a successful life verdict on the Saturday prior to the site visit in Washington Parish. Capital cases are not handled within the office and thus do not strain the already excessive caseloads of staff attorneys. There are two attorneys on contract, James McNary and William Alford, certified to do capital work who handle virtually all of the capital cases. One of those attorneys is about to retire. The handling of capital cases is one of the bright spots of the 22nd PDO.

### 9. Capital Conflict Cases

Conflict cases are handled by thee attorneys outside the office who are certified for capital cases. The office pays only $40 per hour in court and $60 per hour out of court capped at $2000 (which is apparently not rigorously enforced). $750 is also paid for each day of trial. The office does not pay conflict attorneys during the course of the case, which can in some instances last for years. One conflict attorney noted that he had requested payment for

attorney fees and expenses but had not received a response. He also opined that the "underfunding of ...capital...cases presents major problems for conflict attorneys and certainly threatens the adequate representation of ...capital...defendants." He once had a capital case that did not have an investigator assigned for the first year. This same lawyer expressed frustration that because of the low pay in capital cases he cannot meet the ABA *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*. Another conflict lawyer has had a capital case for several years and has yet to be paid anything. He has put on the record that he's not being effective because he's not being paid during the case.

### 10. Life without Parole Cases

Life without parole (LWOP) cases are handled by the felony staff attorneys. This results in a significant strain to those lawyers with already excessive caseloads. Further, because the office assigns attorneys to divisions of court, there is no distinction made between experience levels. If an LWOP case arises in a particular judge's court, then the lawyer assigned to that division is responsible for representing that client irrespective of his or her experience level. The first assistant suggested that there be a "Life Without Parole Task Force," an idea that should be seriously considered.

### 11. Misdemeanors

Misdemeanor practice appears to consist of processing as many cases as is possible in as quick a time as possible. One attorney called misdemeanor practice a "cattle call." Another attorney stated that he didn't see the need to use investigators in misdemeanor court. The same attorney stated that his misdemeanor caseload was "manageable but only because I have a reasonable DA."

In *Minor Crimes Massive Waste: The Terrible Toll of America's Broken Misdemeanor Courts* (2009), the authors state that the "explosive growth of misdemeanor cases is placing a staggering burden on America's courts. Defenders across the country are forced to carry unethical caseloads that leave too little time for clients to be properly represented.

As a result, constitutional obligations are left unmet and taxpayers' money is wasted." Such is the situation in the 22nd Judicial District.

### 12. Juvenile Cases

The site visit did not include a visit in juvenile court. One of the attorneys stated that the felony attorneys "look down" on the attorneys in juvenile court. As addressed above, juvenile attorneys are carrying excessive caseloads. Any further assessment should address the quality of representation in juvenile court.

### 13. CINC

The site visit did not include a visit to family court. There are six attorneys on contract handling CINC cases as well as a number of the full-time lawyers who also handle mixed caseloads. This allows the handling of the child's delinquency case as well as the parent's CINC case. Four of the contract attorneys are paid $30,000 each, with the other two

being paid $20,000 and $10,825 respectively.  One staff attorney said that because of the caseloads, the attorneys do not go to family team conferences, which she said "is not good." She also stated that caseloads also kept attorneys from filing necessary motions.  "In CINC there's a lot we could do—filing exceptions to case plans, for example, but we don't because of the lack of time."

### 14. Nonsupport

A unique feature of the 22nd PDO is that one attorney devotes all of her time to "nonsupport" whether there is jail time associated with it or not.  This includes a category of "fix child support," which seems completely beyond the scope of public defender work.  The placement of a public defender in court to handle nonsupport cases was secured as a result of a grant of funds from the judiciary to the 22nd PDO.  The attorney was hired without job duties, with no training, and with no evaluations.  "I converted the job into what I found."  The attorney handled 174 child support contempt cases in 2010, 10 child support decrease, and 1074 "fix child support," which appears to be far too many for one attorney.  She stated that she had 100 cases on one docket.  She has little time to write motions as she is in court 4-5 days per week in both parishes.  She stated that she runs into many cases involving paternity and does not know whether she should be involved or not.  No guidance is being provided by leadership.  One attorney, now serving as a misdemeanor attorney, left the 22nd JPDO because of the caseload when he was the sole attorney working on nonsupport cases.  He said that he had requested an additional attorney be placed in nonsupport, but that request was ignored. One must also wonder whether handling the cases for which a public defender is not available at a time when the office is suffering from excessive caseloads is wise or not.

### 15. Use of experts

Guideline 4.1 of the NLADA Performance Guidelines as well as Rule 717(B)(7) state that "Counsel should secure the assistance of experts where it is necessary or appropriate to: (a) the preparation of the defense; (b) adequate understanding of the prosecution's case; (c) rebut the prosecution's case."  The use of experts by public defenders in the 22nd JPDO is not extensive.  The office spent only $6996 on "expert witnesses" in 2011.  Given the high volume of serious felony cases, including cases carrying life without parole, the use of experts appears to be far too low.   Like the lack of investigations, preliminary examinations, and motion practice, this is a symptom of a system that does not value vigorous defense.

One reason for the low expenditures on experts is that the process discourages their use. The District Defender must approve all expert fees.  One attorney stated that the "atmosphere is adversarial" when it comes to experts.  There is no "clear policy" on how to get an expert, but it is known that requesting an expert is not encouraged.  One lawyer once had DNA involved in a case but did not request his own expert because of the "atmosphere" in the office.  The same lawyer stated that another lawyer was "raked over the coals" for requesting an expert.

**16. High number of felonies**

The consultant was struck by the large number of felonies compared to misdemeanors in this parish. In 2011 there were 4061 felonies and 4376 misdemeanors cases handled by the JDPO. This could be the result of overcharging by the police or the lack of evaluation by the DA's office. Either way, it exacerbates the caseload problem significantly. Further study needs to occur on this point in any effort to identify and achieve further efficiencies in the 22nd JDC.

**17. High number of probation revocations**

There appear to be an unusually high number of revocations in the 22nd Judicial District Court. In 2011, there were 3020 handled by the PDO. This appears to be an extraordinarily high number, exacerbating the excessive caseloads of the defenders and clogging the courts. This needs further study.

# III. COMPLIANCE OF THE 22ND PDO WITH ABA PRINCIPLES AND GUIDELINES FOR INDIGENT DEFENSE SERVICE DELIVERY

## A. Compliance with ABA's 10 Principles

One of the most important methods for evaluating a public defender system is the ABA *Ten Principles of a Public Defense Delivery System* (2002). The following observations about the 22nd JPDO are made, using these benchmarks as a framework.

(1) **The public defense function, including the selection, funding, and payment of defense counsel, is independent.** With the establishment of the LPDB, and the abolition of the local indigent defense board, the 22nd PDO is now structurally independent from the judiciary. Act 307 theoretically has established independence as a matter of law. A story was related, however, about a district judge who complained about a particular lawyer, causing the District Defender to move that lawyer to another parish. Another story was told about a judge walking to the office to demand that a lawyer unfamiliar with the case come to court to try a case that day. Both stories demonstrate that the independence achieved is fragile.

(2) **Where the caseload is sufficiently high, the public defense delivery system consists of both a defender office and the active participation of the private bar.** The 22nd PDO meets this particular principle. They have what is virtually a full-time office with active participation by private lawyers who participate on a conflict panel. There seems to be no animosity between the

private bar and the public defender's office.  The private bar is an important resource in the 22nd Judicial District. .

(3) **Clients are screened for eligibility, and defense counsel is assigned  and notified of appointment, as soon as feasible after clients' arrest, detention, or request for counsel.** Principle #3 is met for the most part in the 22nd PDO.  Clients are screened for eligibility at or after the 72-hour hearing by the magistrate and investigators from the office.  An application form is filled out by the client.  Counsel is then assigned immediately based upon the division of court in which he is placed.  There is a concern that there is insufficient scrutiny being given to eligibility at the screening stage.

(4) **Defense counsel is provided sufficient time and a confidential space within which to meet with the client.** This standard is not met.  Caseloads preclude being provided sufficient time.  Nor do attorneys have a confidential space within which to meet clients. They do not have individual offices in the Covington Office. Attorneys complained that they have to see clients in the video arraignment room at the jail and that there is no other decent place to see clients.

(5) **Defense counsel's workload is controlled to permit the rendering of quality representation.** As indicated above, caseloads in the 22nd PDO far exceed national standards.  There is no overflow mechanism.  Thus, the office fails to meet this standard.

(6) **Defense counsel's ability, training and experience match the complexity of the case.**  The office meets this standard only in part.  The District Defender hires lawyers and assigns them to a particular task, such as misdemeanor court or felony court, based upon his opinion of their ability and experience.  Once a lawyer is placed in a particular division, they handle all cases in that division, including cases involving a sentence of LWOP.  This means that attorneys who have never tried a felony case are representing a defendant with LWOP as a possible sentence.

(7) **The same attorney continuously represents the client until completion of the case.** One of the great accomplishments of John Simmons'   leadership   is   the   establishment   of   vertical representation in the PDO.  The same attorney assigned at the beginning of the case continues to represent the individual through sentencing. This achievement is diminished, however, by

the lack of advocacy after the 72-hour hearing and before arraignment.

(8) **There is parity between defense counsel and the prosecution with respect to resources and defense counsel is included as an equal partner in the justice system.** The 22nd Judicial District fails this principle. There is no parity in overall resources between the DA's Office and the Public Defenders' Office. (See discussion above).

(9) **Defense counsel is provided with and required to attend continuing legal education.** The 22nd PDO only partially meets this principle. There is no in-house training and little money is spent on out-of-state training. There is little emphasis on training inside the office. An experienced attorney questioned the consultant regarding the need for training for attorneys who are experienced.

(10) **Defense counsel is supervised and systematically reviewed for quality and efficiency according to nationally and locally adopted standards.** The office fails this principle. There is one supervisor, the District Defender, who does not supervise his lawyers. The first assistant is available to answer questions, but otherwise does not supervise the lawyers. There are no case reviews, no file reviews, and no in-court observations done by the District Defender. The attorneys work as virtually independent contractors.

B.   **Compliance with ABA's 8 Guidelines**
   Another method for evaluating steps taken by leadership in addressing excessive caseloads is to look at the ABA *Eight Guidelines of Public Defense Related to Excessive Workloads* (2009). These are summarized below.

(1) **Excessive caseloads are avoided.** The 22nd PDO has excessive caseloads.

(2) **Office supervisors continuously monitor the workloads of its lawyers.** There are no office supervisors. The District Defender does not continuously monitor the workloads of the lawyers.

(3) **The office trains its lawyers in the professional and ethical responsibilities surrounding caseloads.** There is no training in the office on what lawyers should do when they believe that their caseloads are excessive. There is little discussion of the issue.

**(4) Office managers determine whether caseloads are excessive or not.** The District Defender does not pay attention to this issue. He does not believe the caseloads of his attorneys are excessive.

**(5) The office takes prompt action to avoid excessive workloads, including providing additional resources, curtailing new case assignments, reassigning cases, assigning cases to private lawyers, etc.** The office has not addressed this particular issue. Virtually all of the attorneys on staff have excessive caseloads. The District Defender is not aware of this fact, and has taken no action to deal with it.

**(6) The office files motions asking the court to stop the assignment of new cases.** This has not been done.

**(7) The office resists judicial directions interfering with the management of the office.** Because management has not tackled the excessive caseload issue, the judiciary has not been required to respond.

**(8) The office appeals a court's refusal to stop assignment of new cases.** Again, this has not become an issue in the 22nd Judicial District .

## IV. OFFICE MANAGEMENT OBSERVATIONS

### A. Office Culture

The culture of an office, while admittedly amorphous, can sometimes determine the quality of representation that clients are given. The culture of the 22nd PDO is one that appears to be downtrodden, tired, and unresponsive. It is an office that is physically cluttered. It is not welcoming to clients and their families. Lawyers avoid coming to the office. There is no sense of an office that is committed to indigent defense, that is client-centered, or that is ready to advocate for justice for the indigent accused. Lawyers are hired into the office to handle a particular division. "Then you're left alone," according to one lawyer. Another lawyer stated that the office "is in decline." She stated that the office had no culture, no leadership, and the culture was "virtually nonexistent." Another attorney stated that there was sexism in the office that came from the top. Another lawyer stated that there is not a client centered culture. "You are not rewarded for working hard. You are rewarded for not rocking the boat." Another lawyer stated that "there's a certain amount of fear. There's not freedom to say what you think." Another lawyer said that the quality provided by the lawyers was "uneven" and that some of the attorneys were not always willing to "suit up and fight." One of the first and most

important tasks of new leadership will be to understand and then attempt to change the culture of the 22nd JPDO.

### B. Physical Plant

A universal complaint was heard regarding the physical plant where the Covington Office is located. The office is seriously lacking in professional appearance. It is cluttered with boxes and files in the hallway and ceiling tile coming down from the ceiling. There are no private offices for attorneys. The reception area is unattractive and uninviting. One attorney stated that she would not go to the bathroom in the office because it was so filthy. She called the office a "bullpen." Another attorney complained that smoking was allowed in the office despite complaints being registered. The office does not invest in a housekeeping service, and thus the office is unclean and cluttered. Complaints have been heard about mice and bats in the Covington Office. Another attorney said that the office conditions were "deplorable," and lamented that he "had no desk. Each attorney should have a desk and a computer." The physical state of the contributes to the negative culture of the office itself.

### C. Leadership

There is one leader in the 22nd JPDO, and that is John Simmons. He has been the leader since he came shortly after the office opened. He has made virtually all of the decisions in all matters since that time. There is no leadership team, nor any supervisors who share decision-making. Remarkably, the first assistant stated that he is not involved in the decision-making in the office. Now that Mr. Simmons has announced his retirement, there is a vacuum of leadership. Worse, there has been no effort to engage in succession planning. A staff attorney noted that she went to an NACDL meeting and came back with ideas for grants. She was told that it wasn't her job to worry about grants and that she would "never be a leader in this office." There is but one leader and others in the office do not appear to be empowered to raise issues or ideas nor to rise to positions of informal leadership.

### D. Office Manager

Jack Stevenson is the office manager and, with John Simmons, runs the day-to-day operations of the office. He has an MBA and is a retired US Naval Commander. He is in charge of accounting, budgetary matters, human resources, the health care administrator, and IT. He appears to be quite competent, although he also appears to be overloaded with many duties. He is an asset to the office.

### E. Supervision

There is little supervision done in the 22nd JPDO. John Simmons is ostensibly the supervisor over all of the trial attorneys. In practice, Mr. Simmons is available to answer questions, but otherwise does little to no supervision. The same can be said of his first assistant, Kevin Linder, who, when asked what being trial supervisor meant, answered "that's a good question." He went on to say that he "makes himself available." One felony attorney said that "we're on our own." Few attorneys viewed the first assistant as a resource for them; more viewed Mr. Simmons as one. There is no performance planning and evaluation, no case reviews, no file reviews, little in the way of court observations. Mr. Lindner has on occasion

second-chaired one of his trial lawyers new to the practice. It should be noted that Mr. Lindner does not carry a caseload so has ample time to engage in active supervision were he assigned to do so. There are no supervisors over the juvenile, CINC, or misdemeanor lawyers other than Mr. Simmons.

### F.  Performance Planning and Evaluations

Performance planning and evaluations are an essential part of a well-functioning office. The consultant was given a performance appraisal form developed by Jack Stevenson that addresses attendance; attention to detail, work quality, dependability, teamwork, initiative, jailhouse and office visits, and communication skills. This process was never implemented after the development of the form.

There are no performance agreements in existence between management and employees. There are no performance improvement plans. There are no performance meetings during the year, nor an evaluation on an annual basis. It should be noted that performance planning and evaluation is required by the contract entered into between the LPDB and the 22nd JPDO.

### G.  Training

There is no formal training program for new lawyers. Lawyers begin in misdemeanor court and family and juvenile court, with placement in felony court coming later. Nor is there access to much CLE by going out of state. There is not an emphasis on training in the office.

### H.  Recruiting

John Simmons does all of the hiring. Mr. Simmons does not recruit in the law schools, but rather always has a number of resumes available to him.   One lawyer called his practice one of "convenience." New lawyers or new blood are not sought out in the recruiting process. Rather, Mr. Simmons looks for experienced people to hire. The first assistant is not consulted in hiring decisions. He expressed that he wished the office hired law clerks and interns and that they would recruit at the state law schools. One attorney stated that there was poor quality among some of the hires, and that the problem was one of not having a recruiting program, that hiring was based upon friendship and nepotism. Mr. Simmons expressed that he feared getting rid of any attorneys because he did not feel he could recruit attorneys "who could do any better."

### I.  Policies and Procedures

There is an Employee Handbook revised as of January 2010 written by Jack Stevenson. Its implementation is unknown. It begins with a good office mission statement. It contains a number of good personnel policies. It establishes a probationary period of 90 days. It has a compensation policy that is vague and of little use—it basically states that compensation is a private matter and that someone may be terminated for violating the confidentiality of the policy. Another policy states that salary increases are made based upon performance and "value to the organization." Liability insurance is provided by policy. Work hours are set out, although no lunch hour is provided, and staff is expected to eat lunch while working. There is a policy noting that there is no janitorial service and that all employees are expected to clean up

after themselves. There is a policy stating that an attorney "shall not engage in the private practice of criminal law under any circumstances," which appears not to be followed. Civil practice is permitted as long as it "does not interfere with the employee'[s responsibilities to the Organization." There is a policy noting the intent to hold monthly staff meetings. These are rarely if ever held.

### J.  Policy Work

There is little policy work presently being done by the 22nd PDO in the criminal justice system. The office does not participate in drug court despite the fact that this is desired by at least one of the district judges. It should be noted that community advocacy is a part of the contract entered into between the LPDB and the 22nd PDO. The District Defender does not appear to be a player in the criminal justice system of the 22nd Judicial District.

### K.  Staff Meetings

These are not held. On occasion, some of the lawyers will get together to talk about cases, but this is nothing formal. The consultant was struck by how little communication there is in the office from the District Defender to staff, inside work units, and between all staff.

### L.  Salaries

Salaries are set by John Simmons. Salaries range from $45,000 to $73,433, with no apparent differentiation between responsibility and experience. For example, a juvenile lawyer with 20 years of experience makes $55,000, while a misdemeanor lawyer with 3 years of experience makes the same amount. A felony lawyer with 18 years of experience, 11 of it in the office, earns $58,634. There are no merit increases based upon a performance evaluation. There are no steps set by the office. One attorney said that the lack of raises, and particularly a raise structure based on experience, is "disheartening." Another attorney said that there was "no rhyme or reason who gets paid what." Another staff attorney said the salaries were "inadequate if you want to live and not practice privately. I'm a career PD but I don't know if I can do this anymore. I haven't had a raise since 2006. There is no retirement. There are no merit increases." There is a great deal of salary compression. One staff attorney complained that her salary was too low to pay for her student loans. She had borrowed $40,000, and now owes $42,000 because she is unable to pay any more than the interest payment.

These salaries are not in parity with the DA's Office. Principle #8 of the ABA *Ten Principles of a Public Defense Delivery System* (2002) mandates "parity of workload, salaries, and other resources..." For example, the DA's Office has a category of "Executive Counsel/ADA" that makes $182,892 per year in one instance and $148,491 in another instance. Several DA's earn over $100,000 per year. As mentioned in the ACLU letter, the average assistant DA's salary exceeds $80,000 while the average public defender's salary is under $60,000.

### M.  Benefits

The office has a health care plan run by Humana. It includes health care, dental, and vision. However, one staff attorney complained that she had to pay $2500 out of pocket even with her health insurance. The biggest deficit in the office is that no one on staff has

retirement. Apparently there was a one year window available in the 1990's to join a retirement plan, but the local indigent defense board voted it down. "This bums a lot of us out," according to one staff lawyer. Retired District Judge Hedges said that "you can't keep people without retirement. That's not right." A staff attorney said that the lack of retirement made her "feel inadequate."

## V.   JUSTICE SYSTEM FUNCTIONS RELEVANT TO THE 22nd PDO'S Operations

### A.   Prosecutorial Function

The prosecutor's office is located on the 2nd floor of the judicial center in a very nice office. It is well staffed. Each section of court has an assistant DA, a secretary, and an investigator.

The DA's Office is vigorous and energetic. It prides itself in the number of jury trials they handle each year. First Assistant District Attorney Hammie Gascon stated that the office regularly tries the 2nd most cases of any prosecutor's office in the state. He called the office "dynamic."

Numerous public defenders complained that prosecutors in the 22nd Judicial District did not screen cases adequately. A conflict attorney said that prosecutors "accept everything." One attorney said that prosecutors believe juries are the proper screeners. An interview with the 1st assistant prosecutor provided support for this. He stated that his office took 98% of all cases that were charged. Another complaint registered by a conflict lawyer was that the DAs use the threat of double billing to obtain pleas to weak cases.

### B.   Judicial Function

Judge Peter Garcia set up a meeting with the consultant and John DiGiulio to discuss any ideas or thoughts the judges had regarding the 22nd PDO. He invited all of the judges to a noon time meeting, but none of them came. He expressed strong support for a well-funded public defender's office. "I've been a fighter for public defenders my whole career." He noted that he had worked with a legislator to introduce a bill to fund the local office through reform of the bail bond system. Judge Garcia expressed disappointment that the PDO had decided not to participate in drug court.

### C.   Determination of Indigency

The determination of indigency is made initially at the 72-hour hearing by the magistrate. This is a cursory review involving little more than asking the defendant whether he intends to hire a lawyer, and if not, whether he wants a public defender. There is no financial information available at that time other than whether the defendant is employed or not. Thereafter, the public defender investigator works with the defendant to fill out an "application for court appointed lawyer." This document includes the number of dependents, employment and income status for the defendant and his or her spouse, and details regarding the defendant's gross income. The form does not list the holding of other property nor the

detailing of expenses. A similar application is filled out at the PDO by persons who are out on bond. The ultimate decision regarding eligibility is made by the PDO public defenders' office, and there is no checking of financial information by either the judiciary or the public defender.

## VI.   PRELIMINARY RECOMMENDATIONS

1. **Hire a strong leader**. John Simmons has been a strong and effective leader for many years. However, he has clearly been declining in his leadership in recent years and it is good for the system of indigent defense that he has announced his resignation. He seems powerless to change the culture of his office, and it seems to run primarily on auto-pilot. For example, he is not satisfied with how often his attorneys see their clients, but does not feel he can do anything about this. He could not identify a time that he and Walter Reed, the District Attorney, had sat down to discuss a particular policy issue. He has always talked with a second or third assistant at the DA's Office rather than assuming that he is on a par with the DA. He does not appear to have intervened when judges have treated his lawyers unfairly. He has not intervened with the Sheriff's Office over access to clients on weekends or at night. The office needs a strong leader who views himself or herself as on a par with the DA and can serve as a "Co-Manager" of the local criminal justice system along with the Judiciary and the DA. Judge Peter Garcia stated that the new leader needed to be a good trial lawyer, a person who can go out in the community to educate people about the value of indigent defense, and someone who is "active." Retired District Judge Patricia Hedges described what was needed was a "dynamic personality, someone who will take control and supervise people, someone who is a good lawyer, someone who will stand up to the authorities to argue for more funding, someone with a strong public presence, who can make the case for indigent defense." These are good ideas. The new leader needs to be an excellent trial lawyer who comes with the experience of running an office. He or she needs to be a student of leadership. He needs to be willing to listen to staff and the client community. She must be client centered and committed to building a client centered office. He must value supervision, mentoring, and building his lawyers into excellent lawyers. She must be an excellent communicator both within and outside the office. He must be a reformer, someone willing to commit to changing the office. Reforming the 22nd PDO starts with hiring an excellent public defender leader.

2. **Lower caseloads for felony, misdemeanor, and juvenile attorneys by hiring additional staff attorneys and support staff**. This is one of the three problem areas identified in the ACLU letter. High caseloads threaten to overwhelm the insufficient resources and the attorneys and staff hired with those resources. At present, there is one attorney assigned to each division of court. Some of the attorneys interviewed recommended a doubling of this staff. This is one of the primary needs of the office and is of course dependent upon the raising of significant new revenue.

3.  **Establish workload standards with an overload mechanism.** The commentary to Principle #5 of the ABA *Ten Principles* states that "National caseload standards should in no event be exceeded, but the concept of workload (i.e., caseload adjusted by factors such as case complexity, support services, and an attorney's nonrepresentational duties) is a more accurate measurement."  The ACCD *Statement on Caseloads and Workloads* (2006) also emphasizes workloads consistent with quality, saying that "Case weighting studies must be implemented in a manner which is consistent with accepted performance standards and not simply institutionalize existing substandard practices."  At some point, the new District Defender should consider a workload assessment, or in other words, a case weighting study.  This is set out in detail in *Securing Reasonable Caseloads: Ethics and Law in Public Defense* by Norman Lefstein (2011).  More importantly, the District Defender needs to work toward an overload mechanism that would operate as a safety valve when her lawyers' caseloads become excessive.

4.  **The new District Defender should work with the LPDB and local government to establish retirement benefits for all full-time staff.** There is no justification whatsoever for the staff of the public defender's office to be the only part of the criminal justice system without retirement.  Nothing symbolizes more the 2nd class citizen status of the public defender than this fact.  John Simmons states that he once tried to get retirement for his staff but that the "judiciary killed it."  For whatever historical reason, the fact that the staff at the PDO works as the only part of the local criminal justice system without retirement benefits is unconscionable.  St. Tammany Parish is one of Louisiana's wealthiest, and thus capable of solving this problem.

5.  **The Office needs to move from its present quarters into more professional office space.** The office is in an abysmal space.  It looks like a typical social services office in a poor community. The comparison with the lavish parish courthouse, where the judiciary and DA are both housed, could not be more dramatic.  Sheriff Strain expressed that he was "outraged" when the PDO was stricken from plans for the new judicial center.  Judge Peter Garcia stated that there was a move afoot to get the parish to provide better space for the PDO. Their support should be combined with others' support to effectuate a move into more professional office space.

6.  **The new District Defender must work with the informal leaders of the office to create a client centered culture.**  The 22nd PDO is not a client centered office.  It is not an office where systemic injustices are attacked either by the Chief or as an office-wide effort.  It appears to be an office that is rudderless; one that has lost its heart.  One staff member stated the following when asked about the office reputation among the client community: "Get you a private attorney."  One of the primary tasks of the new District Defender will be to change that perception.

7.  **Attorneys should be present at 72-hour hearings.**  There are no attorneys at the 72-hour hearings. Neither are there prosecutors present.  As a result, there is no advocacy for bond or for release for any other reason at this time.  There are no dismissals based upon

information that only a defense attorney would be able to provide. There are no pleas to a reduced charged. There are no diversions into the mental health system. A local conflict lawyer stated that he "never understood why lawyers aren't at the 72-hour hearing." This can contribute to better attorney client relationships and overall better outcomes. In fact, a defendant with a lawyer at the first appearance is 2 ½ times more likely to be released on his own recognizance, 4 ½ times more like to have the amount of bail significantly reduced, is likely to serve less time in jail, and is likely to feel better treated by the criminal justice system. (Source: Colbert, Paternoster, and Bushway, "Do Attorneys Really matter? The Empirical and Legal Case for the Right of Counsel at Bail," 23 Cardozo L. Rev. 1719 (2002).)

8. **Attorneys should be required to conduct a significant initial client interview shortly after the 72-hour hearing.** Clients are seen at the 72-hour hearing by an investigator. Statements are taken along with an application for appointment. Statements are taken from clients with no regard to whether a statement is appropriate or not at that stage of the proceeding. Thereafter, it is the practice of the office lawyers not to see their clients for weeks after appointment. There is no bond advocacy, no preliminary examinations, no motion practice, nor development of an investigative strategy. During that time, evidence can dissipate and witnesses can disappear. Clients get frustrated by staying in jail without talking with their lawyer. Further, clients who are out on bond often go to the office to talk to the lawyer and instead of seeing their lawyer are often interviewed by the investigator or by the duty day attorney. It was reported by one of the investigators that a client had been released after 4 months in jail without ever seeing their lawyer. One conflict lawyer said that one of the biggest problems in the 22nd PDO is "attorneys are not seeing their clients prior to arraignment."

9. **Attorneys should be actively involved in advocating for reduced bond and changes in bond conditions.** Bond advocacy is an afterthought in the 22nd JPDO. Yet, vigorous bond advocacy can pay many benefits. There were reports that bond motions are done as a matter of course prepared by secretaries, and that no bond reduction motions are being made for bonds set below $10,000. Attorneys are not writing client specific motions, nor are they setting bond reduction hearings or appearing to advocate vigorously for those bond reductions. Bond advocacy should not be pro forma. "Counsel is crucial for bail determinations. The Supreme Court has stated that '[c]ounsel can also be influential at the preliminary hearing in making effective arguments for the accused on such matters as the necessity for an early psychiatric examination or bail.' The Supreme Court has also recognized that arraignment, where a person's liberty is at stake and prosecutorial forces are arrayed against him or her, is a crucial stage of litigation triggering the individual's Sixth Amendment right to counsel." American Council of Chief Defenders, *Policy Statement on Fair and Effective Pretrial Justice Practices* (2011).

10. **Attorneys should begin to hold preliminary examinations in significant cases.** There are virtually no preliminary examinations held in the 22nd Judicial District Court. Attorneys receive open file discovery usually at or after arraignment. However, open file discovery is no substitute for a preliminary examination. (See also, *State v. Forest*, supra). Several

attorneys cautioned that if a request is made for a preliminary hearing, there is an "unspoken hint of retaliation" by judge and or the prosecutor. The new District Defender not only needs to establish that the attorneys in the PDO will ask for preliminary examinations but also that when there is pushback from the judiciary and DA's Office, he or she will work to make the conduct of preliminary examinations an acceptable practice.

11. **The new District Defender and other management need to support the lawyers when they practice zealously.** There is a perception in the office that the District Defender does not support his lawyers. One former staff member said that what is needed is a "strong leader who exercises power, takes on the judges and the prosecutors, and backs up his lawyers when they challenge the prosecutors." She stated that judges and prosecutors are pressing for pleas at arraignment and "nobody is backing up the public defender in this situation." A conflict lawyer stated that the office "allows DA's and judges to run over the public defenders." Another lawyer said that Mr. Simmons moved a lawyer to Washington Parish when a judge complained.

12. **The office should be restructured emphasizing active supervision.** The office needs to be restructured. The office should be divided into at least two teams or units of felony lawyers with a supervisor over each team. An investigator should also be attached to each team. A third team should be constructed of the misdemeanor and juvenile lawyers. Each of the supervisors should carry a significant caseload. It is not enough to restructure the office, however. The supervisors will need to be trained on what it means to be a supervisor. They will need to learn basic leadership and management skills, including basic coaching skills. They will also need to be taught how to conduct file reviews, case reviews, and performance evaluations.

13. **Require staff attorneys to work full-time with no private practice, with a period for transition.** Having a private practice while working full-time is an entrenched policy within PDO. It allows for attorneys to make ends meet. Yet, it is a practice that does not make sense at a time when caseloads are exceeding national standards. If the problem is the low salary, then that needs to be addressed. As it is, attorneys have an incentive to work as little time on their cases as possible in order to allow them to increase their salaries by working on their civil practice. It will take time, but attorneys should be hired to work full-time at a reasonable salary level, and private practice should be prohibited.

14. **Evaluate the quality of lawyer staff and determine who wants to remain as a full-time lawyer willing to be client centered.** More than one person expressed the opinion that there were attorneys on staff who needed to do something else, attorneys who had lost their zeal for indigent defense, or never had it in the first place. One attorney stated that "the office has a problem getting rid of people." Other attorneys expressed that some of the attorneys in the office viewed their job as "part-time," despite the fact that they were hired to work full-time. Working full-time should mean working at least 40 hours per week. One attorney noted that another attorney in the office worked only 20 or so hours per week.

15. **Attorneys need to spend more time in the office with regular hours.** Attorneys are seldom in the office, other than on their duty day. According to one staff member, attorneys come to the office "once a week or so." One attorney said she did not come to the office because it was such a filthy place to work. John Simmons said that "we have lawyers now who come in and sit and then they go home." He said that he tried to require attorneys to spend time in the office but that this was overruled by the local board. The result of this is that clients come to the office to see their lawyer and instead see the "duty day" attorney. This is inconsistent with vertical representation. Attorneys should be required to come to the office when they are not in court or when they are not out investigating. The practice of dropping by the office only occasionally needs to end.

16. **Create a local Task Force to address the funding deficit with a goal of achieving relative parity with the DA's Office.** There is a lot of local support for improving the 22nd PDO. Sheriff Strain has expressed his willingness to work with the new District Defender to address the issue of underfunding. He expressed that he wants a fair and balanced criminal justice system and believes that the DA's Office should work with his office and the PDO to achieve this. He suggested that a percentage of bond forfeitures would be a good place to look for additional funding. First Assistant DA Hammie Gascon stated that he believed that the PDO is underfunded, including in the capital case area. Judge Peter Garcia agrees that the office is underfunded and appears willing to work to improve the funding imbalance. It appears that the time is right to bring together all parts of the criminal justice system to work on funding for the 22nd PDO.

17. **Explore the possible utilization of the money held in the Judicial Fund to meet the most immediate needs.** More than one observer familiar with the local criminal justice system referred to a large sum of money in the "Judicial Expense Fund" that could be utilized to meet the most acute needs of the PDO. This fund is believed to have over $5 million in it at the present time. It is reported that judges are presently reluctant to spend the money.

18. **Hire more investigators.** It is essential that the investigative function of the office be significantly beefed up and redefined. This is a crucial defense role and at present there are insufficient numbers of investigators to adequately perform this role. Investigations are not being conducted in very many felony cases, and virtually no juvenile or misdemeanor cases. In many instances, staff attorneys are not even aware of the need for an investigator.

19. **Change the duties of investigators.** More important than the number of investigators is what the investigators are assigned to do. They do not function as do most public defender investigators. They function more as paralegals than as investigators. Half their time is devoted to attending 72-hour hearings, facilitating the filling out of applications for appointment, making calls regarding bond, and "making" probable cause determinations. It is highly recommended that a major shift be made to assign the investigators to actually investigate cases. This will require policy changes, with the requirement that investigative

requests be made in writing and reviewed by a supervisor. Cases should be investigated in many instances immediately after appointment when evidence, either real or in the form of witnesses, can rapidly disappear. Investigators can identify who should be subpoenaed for preliminary examinations.   Investigators should be made part of the trial team, participating in case reviews, identifying possible avenues of investigation, participating in brainstorming possible theories of the case and following up with additional investigations.

20. **Determine why the juvenile investigator is not being utilized by staff attorneys.** It appears that the juvenile investigator is not being used by those attorneys handling juvenile court. She has experience in law enforcement. She is spending most of her time doing 72-hour hearings and is otherwise not being used as an investigator. This is a waste of resources that cannot be allowed to continue.

21. **Designate someone other than the District Defender to supervise the investigative function in the office.** At present there is a first assistant to the District Defender, but he does not exercise supervision over anyone. It is recommended that consideration be given to placing the investigators into the units of the office, with supervisory responsibility of the investigators being given to the division supervisor.

22. **Hold regular office meetings.** The new District Defender needs to begin the practice of holding regular office meetings. It has been said that this is an office where staff is afraid to speak. The meetings should be held with an agenda that is distributed in advance. Staff should be made to feel that the staff meeting is a place where issues can be discussed. The new District Defender must demonstrate that he or she is willing to listen to concerns of staff.

23. **Create a system of performance evaluations.** The new District Defender needs to set up a system of performance evaluations. These evaluations should be the responsibility of the supervisors.   The system should begin with a performance agreement between the supervisor and the employee. The system should feature periodic reviews during the year where problems are addressed and feedback given.  It should end with an annual performance review which can lead to merit pay. Jack Stevenson would be a good person to not only devise the performance evaluation system but also to facilitate its implementation.

24. **Create a salary structure that rewards merit and experience.** There needs to be established a salary structure that is well known and predictable.  As it is, there is salary compression, with everyone making approximately the same amount of money.  Both experience and meritorious behavior should be rewarded in the salary structure.

25. **Reform and streamline the provision of conflict services.** The 22nd JDC is fortunate to have a large number of lawyers willing to work for the exceptionally low pay currently being offered. Attention needs to be paid to this segment of the caseload to avoid having a two-tier system of justice. The $40/60 per hour presently being paid is woefully out-of-

date and does not begin to cover the cost of overhead, much less compensate the attorneys for their work. Equally arcane is the cap of $2000 for capital cases, $1000 for felonies, and $600 for misdemeanors. Consideration should be given to reducing the size of the conflict panel, hiring the highest quality lawyers, and putting them on contract. In addition, conflict attorneys must have access to investigators.

26.  **Change how conflict capital cases are handled.** As it presently exists, capital cases are handled by two experienced lawyers on contract who, by all accounts, do an outstanding job. Conflicts are handled by attorneys who are grossly underpaid for their work, reflected both by an unrealistic cap of $2000 and an hourly rate ($40/60) that does not pay their overhead. Consideration should be given to hiring two attorneys full-time to handle all of the capital work, or to giving all of these cases to an outside entity fully funded to do these cases. If conflict cases continue to be assigned to private cases, the ABA Standards should be complied with in full, including the removal of the cap and paying a rate commensurate with that paid in federal court. Attorneys handling conflict capital cases must be paid periodically during the course of a case. There should be no cap for handling a capital case, and an hourly rate should be fixed that is commensurate with that paid in federal court for capital cases.

27.  **Consider creating a Life without Parole Task Force.** This was one of the prime recommendations made by the First Assistant and is worth considering. Such a Task Force or unit within the office would take away the most time consuming cases from the felony attorneys, enabling them to focus on their other felony cases.

28.  **Engage with the Deputy of the LPDB for all attorneys to be trained, including on the Louisiana Performance Standards.** The attorneys in LPDB have received sporadic training at best. While the office is staffed with experienced attorneys, they have not received the kind of systematic training that is required. Training should be developed for the newer lawyers, for the juvenile lawyers, CINC lawyers, and experienced felony lawyers. More importantly, training needs to become a priority in the office.

29.  **Work with the Deputy of the LPDB to identify future leaders and establish a course of education for them to develop into office supervisors and leaders.** Restructuring the office in order to emphasize supervision will do little if those chosen are not educated in what being a leader, manager, or supervisor is all about. The Deputy of the LPDB who is also in charge of education holds regular leadership skills training. The new District Defender is encouraged to work with her to identify new leaders in the office and to schedule training for them.

30.  **Review the provision of nonsupport services.** At one time there were 10 secretaries. This was cut in half as a result of having insufficient funds. This has created a backlog. As new staff attorneys are hired, attention must be paid to the hiring of new support staff as well.

31. **Become a community oriented defender office with the inclusion of full-time social workers.** The trend toward community oriented defending is strong across the nation. It involves the hiring of social workers to be involved with clients and their families in order to identify issues that are causing clients to offend and to devise a sentencing plan to mitigate those issues. The 22nd PDO does not now have a social worker on staff, nor is sentencing advocacy occurring with much enthusiasm. This needs to change.

32. **Improve reliability of the indigency determination.** There is little or no energy devoted to determining whether someone qualifies or not for a public defender. There is no investigation whatsoever done by the PDO, nor is there any scrutiny by the magistrate or court personnel. Public defender funds should be devoted only to clients who are indigent.

33. **Encourage the use of experts and ensure funding for them.** Experts are often needed to provide an adequate defense. DNA and other forensic sciences have become increasingly important, necessitating a defense expert. Yet it is clear that in the PDO, the use of experts is discouraged, with considerations of money trumping zealous defense. There needs to be encouragement from the District Defender and the supervisors to vigorously defend clients, including the use of experts when necessary. A clear policy needs to be written regarding when an expert is needed, the process for obtaining one, and the criteria used to determine whether an expert will be approved. It is recommended that the line attorney submit a request for an expert to a supervisor, with an appeal of that decision to the District Defender.

34. **Evaluate the reason why there are so many revocations and what can be done to significantly reduce that number.** The consultant noticed the high number of revocations carried by all of the felony attorneys. For many of them, half their open cases were revocations. One experienced attorney said that there is little screening going on at the DA's office, and that probation is used in lieu of dismissal. Another staff attorney said that the reality of probation revocations is that there is little or no notice given, there are no factual disputes, and the attorneys simply come to court to resolve the case. Another observer noted that the court can defer imposition of sentence and give a long sentence if the person is revoked, calling the present system "a scam." The new District Defender should work with the DA and the judiciary to evaluate this issue and determine whether changes need to take place.

35. **Evaluate whether revenue is being collected at an adequate and reasonable rate, particularly in Washington Parish.** Many of the reform measures identified in this assessment will cost money. The State of Louisiana, like the rest of the country, is cutting back public expenditures rather than increasing them. The consultant believes that indigent defense is a state responsibility and should be funded out of the General Fund. Until that is a possibility, however, and given the state of the economy at present, the only place to look for increased revenues is at the local level. Fortunately, the 22nd PDO is located in a wealthy jurisdiction, particularly St. Tammany Parish. The new District Defender needs to work with other parts of the criminal justice system to determine what

new revenue can be collected to fund these reforms. Partial fees are one source that should be explored to determine whether it is being collected appropriately. Fees from diversion that are now going to the prosecutor's office should be distributed as well to the public defender's office and the judiciary. The Sheriff also had ideas regarding where additional revenue could be found to support these reforms.

36. **Rotate attorneys more often between divisions of court.** The office has vertical representation achieved in part through assigning attorneys to particular divisions. The downside to doing this is that a public defender attached for a long period of time to a particular judge and a particular prosecutor tends to become part of a team that processes cases. Several attorneys expressed during the interview that one judge "beat up on" a lawyer, while other attorneys stated that they were in "easy" divisions and thus did not have to work as hard. It would be salutary for attorneys to be rotated through different divisions of court in order to not only achieve some level of equity but also to avoid the "teaming" that tends to leave out the client's interest.

37. **The 72-hour hearing should be turned into a more meaningful session of court.** At present, the 72-hour hearing is a rapid and mostly meaningless exercise. A magistrate stands before 15-20 women and 25-50 men and has them come to the front of the jail cell where they are held. Charges are read, bond is quickly set, and probable cause is allegedly reviewed without stating as such. An investigator from the public defender's office is present. Neither prosecutor nor public defender is present. Few if any cases are resolved at that time. Questions by defendants are mostly ignored. After the hearing, if the person fails to make bond, he will remain in jail with little or any contact with counsel for up to 60 days until the DA makes a charging decision. The Parish loses money incarcerating someone whose case may be dismissed. The defendant loses his job and his family suffers from not having the defendant at home with them. Little is accomplished by this state of affairs other than genuflecting to the requirement of a 48-hour review, ironically at 72 hours. If both the DA and Public Defenders' Offices would staff this hearing and along with the judiciary commit to turning the hearing into something meaningful, numerous cases could be resolved at this level. Cases could be dismissed. Defendants could be diverted into treatment. Court and attorney time could then be saved for more serious cases. And the parish could save money on detention costs.

38. **The District Defender should work with the Sheriff to improve the ability of public defenders to see their clients in the jail.** There is considerable frustration among public defenders regarding policies about seeing clients. At present, a fax is sent to the jail an hour before an attorney goes to see his client. However, there were complaints that it is difficult to see more than one client, or the large number who the lawyer needed to see, and that it was impossible to see clients at night or on weekend (unless a trial was occurring the following Monday). The Sheriff seemed to be very receptive to working with the PDO to improve the indigent defense system. This should be one of the new District Defender's first priorities.

39. **Prosecutors should do a more effective job of screening their cases.** The First Assistant DA stated with pride that the DA's Office accepted 98% of its cases.  This is an extraordinarily high acceptance rate.  It leads to taking up a lot of time later in the process, when cases are dismissed.  It is suggested that the DA review his screening procedures and encourage more scrutiny at the reviewing stage.  It is also suggested elsewhere that prosecutors and public defenders staff the 72-hour hearing and that preliminary examinations become a more routine part of the procedure in the 22nd Judicial District. These would have the same effect of allowing for cases to be reviewed and resolved, and in the case of a preliminary examination to have more information developed  in an adversary setting.

40. **If it exists, the practice of pleading cases mid-trial should end.**  Several attorneys alluded to a practice known as "Pick and Pleas" whereby prosecutors insist on trying cases in order to get their statistics up only to plead the case mid-trial.  Others contended that this practice had ended several years ago.  If it still exists, this is fraudulent, inefficient and damaging to the integrity of the court system, and it should be stopped.

41. **The Judiciary should encourage the development of an independent office that is the equal to the DA's Office.**  One long-time observer of the criminal justice system said that there was a "fraternal connection between the judges and the DA."  Another retired lawyer and judge stated that the view of the judiciary toward the public defender's office was "disrespect."  The consultant was unable to interview a significant number of the judiciary, and the one judge interviewed, Judge Garcia, stated that he respected the public defender's office and wanted it to be improved.  However, the analogy of the three-legged stool is apt when it comes to describing the criminal justice system.  Without a vibrant and co-equal PDO, the 22nd Judicial District Court might function efficiently but its justice producing function will be diminished.

42. **Consideration should be given to staffing drug court.**  Judge Peter Garcia said that judges had approached defenders regarding getting involved in drug court, but that he was told they did not have enough resources to be involved, "much to my chagrin."  He also has a behavioral health court in which defenders again are not involved.   It is in the interests of the PDO and the clients of the office for public defenders to be present when important decisions are being made about their clients.  There are drug courts whose procedures work to secure justice and others than are less committed to ensuring due process; the consultant did not review this particular drug court.  However, the new District Defender should review her office's non-involvement in drug court and consider allowing public defenders to participate so long as resources are available to permit this participation.

43. **Attention needs to be given to collecting data accurately and, more importantly, to utilizing that data in the management of the office.**   Accurate and thorough data collection is essential to managing a public defender's office.  The consultant heard on numerous occasions that the data that was being used was not accurate.  This is insidious and can lead to not providing data, and to not using it when it is available.  The

Administrative Assistant needs to work with the JPDB to ensure that the data collected is accurate. The new District Defender thereafter should familiarize herself with the data on a regular basis and begin to use it to manage the office.

44. **The District Defender should utilize law clerks and interns from nearby law schools.** The 22nd PDO is located near two law schools in nearby New Orleans. Law students and interns can provide low cost services in public defender offices. They can also breathe new life into attorneys and an office while at the same time serving as a recruiting device.

45. **Upgraded presentation devices should be purchased so that the public defenders are on a level playing field with the DA's office when trying cases before a jury.**


## VII.  AREAS TO ADDRESS IN A FULL ASSESSMENT

It is unclear whether there will be a further assessment or even the need for one, given the end of the CCTAP program at American University and the findings and recommendations contained in this report. If a further assessment is desired and appropriate, however, it is recommended that the inquiry be completed by July of 2012 and consist of at least the following:

- Evaluate the preliminary recommendations and complete the overall assessment.
- Solidify caseload data. The LPDB has been working since its inception to obtain uniform reliable caseload data for all jurisdictions. Having data that is affirmed as complete and reliable by both the local office and LPDB is essential.
- Study the quality of practice of the felony attorneys. At a minimum, this would consist of completing interviews with all of the felony attorneys as well as reviewing 5-10 files from each of the attorneys handling felonies in both St. Tammany and Washington Parishes. File reviews should be randomly chosen, including at a minimum 1-2 files where a jury trial was conducted to verdict. Attention should be paid to documentation of early and regular attorney-client contact, motion practice, bond advocacy, and sentencing advocacy.
- Attend additional 72-hour hearings in St. Tammany and, particularly, Washington Parishes.
- Attend city courts to determine the quality of services being rendered in misdemeanor cases.
- Study the quality of representation in juvenile cases by attending court and reviewing juvenile attorney's files. It would be important for this part of the assessment to be conducted by someone expert in juvenile and family practice.
- Study the quality of representation in CINC cases by interviewing the CINC lawyers and reviewing their files.
- Study the quality of representation in capital cases by interviewing the two lawyers on contract and reviewing their files.

- Evaluate why there are so many felonies and why the DA's Office is not culling out some of the charges prior to billing.
- Evaluate why there are so many revocations.
- Obtain the full budget of the DA's Office in order to better evaluate the issue of parity with the 22nd JDC.
- Speak with a representative number of clients in order to evaluate client relationships.
- Evaluate whether there are a significant number of non-indigent persons being appointed a public defender. This would involve choosing a random number of those appointed, reviewing their application, and following up with them to determine indigency.
- Determine how often judges order a partial fee and whether this could be a significant source of funding for the office. This would involve perusing sentencing orders, interviewing judges, and reviewing the financial information of those who appear to be able to pay some part of the partial fee.

It is estimated that a follow-up assessment effort covering most of the above matters, if desired by the LPDB, could be completed within 100-150 hours of additional professional effort. It is recommended that evaluation of the quality of representation in juvenile and CINC cases be conducted by a separate individual with expertise in those areas of advocacy, and the current consultant is not able to estimate with certainty how much time that component of a follow-up assessment would require.

## VIII. CONCLUSION

The 22nd PDO has had a long history as a mostly full-time office using vertical representation to provide services to indigents accused of crime. Over time, as the population and caseload increased, as the judiciary and DA's Office increased and moved into a new state-of-the art facility, the PDO remained stuck in a tired and run-down office with defenders with too many cases and supplementing their low salaries with private practice. As the District Defender retires, it is time for the 22nd PDO to become a 21st Century public defender's office that has parity with the prosecution, that is independent from the judiciary, that has attorneys with reasonable caseloads, and that is client centered.

**APPENDIX**

## A. Documents Reviewed

The following documents were reviewed as part of this assignment:

- Letter from Jason D. Williamson, Staff Attorney with the ACLU to Jean Faria, State Public Defender, dated September 7, 2011
- Letter from Jean Faria to Ms. Caroline Cooper, Research Professor and Associate Director, Justice Programs Office at American University
- Documents provided on a Zip File by John DiGiulio, including:
  - Budget Overview 2008
  - Additional Support Request
  - Change to Cash Accounting
  - Child in Need of Care Cost Estimate
  - CINC Adult Planning
  - CINC Adult Planning LPDB
  - Conflict Counsel Survey 2008
  - District Allocations File 2008
  - Employment Application
  - LAPDB Standards
  - LPDB Strategic Plan
  - 73 e-mails
  - 22nd JPDO Budgets from 2006-2011
  - Open and Closed Caseloads for the 22nd JPDO from 2006-2011
  - 2008, 2011, and amended 2011 Organizational Chart
  - Payroll from 2006-2011
  - Profit and Loss Statements 2006-2011
- Documents provided by Jason Williamson, (excluding those mentioned above) including:
  - 152 pages of figures from the DA's office
  - Raw data on open public defender cases in 2006-2011 per attorney by charge and defendant
  - Raw data on closed public defender cases in 2006-2011 per attorney by charge and defendant
  - Capital case guidelines
  - LPDB Capital Defender Certification Structure
  - 17 pages of spreadsheets prepared by Jack Stevenson
  - Letter from General Counsel Roger Harris to State Public Defender Jean Faria
  - Overview of office written by John Simmons on 2/11/09 expressing budget concerns
  - 22 page budget request instructions
  - District bulletin dated July 1, 2009
  - 109 page proposal to adjust DAF formula to account for shortfall and surpluses in 2nd half of FY 09-10
  - Performance guidelines for CINC Parents and Termination Cases
  - 324 page Juvenile Defender Trial Practice Manual

- o  33 page contract for PD services for 2010
- o  Trial Performance Standards
- o  Eight documents pertaining to training offered by LPDB
- o  20 pages related to preliminary examinations
- o  120 pages of time sheets
- o  339 pages of monthly expenses
- o  Performance Appraisal Form
- o  10 page Defender Data document
- o  Employee list
- An e-mail from Jennifer Crusturner to John DiGiulio dated November 14, 2011
- "A Blueprint for Change for the 22nd Judicial District Indigent Defender's Office" prepared by John Hogue
- "Pro-Active Leadership: changes that can be implemented immediately to improve the delivery of public defender services in the 22nd Judicial District" prepared by John Hogue
- 22nd Judicial District Public Defender Office St. Tammany and Washington Parishes Employee Handbook
- 22nd Judicial District Court Annual Financial Statement December 31, 2010
- Benefits Form prepared by Jack Stevenson
- Time Sheets for 2011
- Application for court appointed lawyer forms
- Form entitled "Steps necessary to post a property bond"
- 72 Hour Hearing Docket forms
- 2010 Revenues and Filings
- Salary charts prepared by Jack Stevenson
- Four excel caseload charts prepared by David Newhouse

## B.  Persons Interviewed

The following persons were interviewed during the consultant's on-site visit:

- Jean Faria, Louisiana Public Defender
- John DiGiulio, Trial Compliance Office with the LPDB
- John Simmons, District Defender of the 22nd PDO
- Kevin Linder, First Assistant of the 22nd PDO
- Jack Stevenson, Administrative Assistant
- Sheila Hayes, Office Manager
- Nan Bousfield, Juvenile Attorney
- Mark Jolissaint, Conflict Attorney
- Patricia Fox, Former 22nd PDO Attorney and present Conflict Attorney
- Bruce Stacklin, Investigator
- Desiree Wright, Investigator
- Sheriff Rodney Jack Strain Jr, Sheriff of St. Tammany Parish

- Tim Lentz, Chief Deputy Sheriff
- Brian Trano, Deputy Chief Sheriff
- Patricia Jedges, Retired District Judge
- John Lindner, Conflict Attorney
- Darrell Sims, Misdemeanor Attorney
- Amanda Trosclair, Juvenile Attorney
- Donald Fendlason, Retired District Judge
- Houston "Hammie" Gascon, First Assistant District Attorney
- Peter Garcia, District Judge
- Jerry Fontenot, Conflict Attorney
- Melissa Brink Valdivia, Felony Attorney
- Michael Bradley, Misdemeanor Attorney
- Jennifer Crusturner, Nonsupport Attorney
- John Hogue, Felony Attorney

## C. <u>Organizational Chart of the 22nd Judicial District Public Defenders' Office</u>

**Chart appears on the following page**



## 22nd Judicial District Public Defender Office Organizational Chart

**ACCOUNTING, PERSONNEL, HEALTH CARE ADMINISTRATOR, FELONY PROBATION, INTAKE FEE CLERK, APPEAL DB & CONFLICT PANEL CLERK PHYSICAL RECORDS MAINTENANCE & IT**
John D. Stevenson

**DISTRICT PUBLIC DEFENDER**
John R. Simmons, Jr.

**EXECUTIVE SECRETARY**
Mrs. Linda R. Fussell

### CINC ADULT CONTRACT DIVISION
Dr. Randall Fish
22'rd JDC Covington

William Arata
Bogalusa City Court

Carole G. Guillin
Slidell City Court

John Allen
22'rd JDC Franklinton

Joseph B. Harvin
Slidell City Court

### CITY COURT DEFENSE
**SLIDELL CITY COURT:**
Msdm/Traffic:
d'Andrea Chatman

Juv /CINC-M/Msdm:
Nancy Bousfield

Support Staff:
Msdm/Traffic/Juv Admin
Tracy Nettles

**BOGALUSA CITY COURT:**
Juv/Msdm/CINC-M/Traffic:
Shannon Mese

### WASHINGTON PARISH DISTRICT COURT DEFENDERS
Kevin Linder–Trial Supervisor
Div B: John W. Houge, III
Div E: John Almerico
DivA: James Talley
72'sMSDM          Mark James
DIV K  Juv/CINC-A:
Mark James

Non-Support:
Jennifer Cruiseturner

SUPPORT STAFF
Dana Walston: DIVA & E

Ashton Burris: Misd. NS, Juv

### ST. TAMMANY PARISH DISTRICT COURT DEFENDERS
Kevin Linder–Trial Supervisor
Div B  John W. Houge, III
Div C  Melissa Valdivia
Div D  Robert Stamps
Div F  David Craig
Div G  Peter Ierardi
Div H  David P. Sirera
Div I  Richard (Dale) Oriol
Div J  Michael Capdeboscq
72/MSDM  Michael Bradley
72/MSDM  Darcell Sims
NS      Jennifer Cruiseturner
DIV L JUV/CINC:
Amanda Trosselair
SUPPORT STAFF:
Bruce Shacklin: Investigator
Desirae Wright:Juv Investigator
Sheila Hayes: Div  D F H
Belinda Welsh: Div C I  J
Rachel Cook: Div G B
Shannon Donnelly  Data/Projects
Janice Magee: Misrn
Kealy Dryer – NS Juv CINC
Holly West  Reception and 72s

**CAPITAL DEFENSE**
**FIRST CHAIR**
William Alford
**SECOND CHAIR**
Kevin McNary
**MITIGATION SPECIALIST**
Melissa Davis

Prepared Thursday, November 03, 2011

Page 44 of 44

*A Criminal Courts Technical Assistance Project: TA Report No. 7-190, American University*